# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 20-cv-977

THOMAS CARRANZA;
JESUS MARTINEZ;
RICHARD BARNUM;
THOMAS LEWIS;
MICHAEL WARD;
COLBY PROPES; and
CHAD HUNTER,

      Plaintiffs, on their own and on behalf of a class of similarly situated persons,

v.

STEVEN REAMS, Sheriff of Weld County, Colorado, in his official capacity,

      Defendant.

---

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

---

Plaintiffs Thomas Carranza, Jesus Martinez, Richard Barnum, Thomas Lewis, Michael Ward, Colby Propes, and Chad Hunter, on their own and on behalf of a class of similarly situated persons, by and through their through their attorneys, bring this Complaint for Injunctive and Declaratory Relief against Weld County Sheriff Steven Reams in his official capacity, and state as follows in support:

### INTRODUCTION

1.     You are likely reading this Complaint from self-isolation in your home. Now imagine if someone sick with COVID-19 came into that home and then sealed the doors and windows behind them. That is what the Weld County Jail has just done to hundreds of human beings currently detained there, where COVID-19 is confirmed, physical distancing is impossible, and yet no one detained can leave.

1

2.     We are in the midst of the most significant pandemic in generations.[1] A highly contagious and deadly virus called coronavirus has swept the globe. While no one is safe from transmission of the virus, jails, by their very nature, are especially prone to being epicenters of disease. This is true not only because of crowded conditions in the jail and limited access to hygiene products and medical care, but also because jails disproportionately house people who are at high-risk of serious illness or death if they contract the virus. This case seeks safety for high-risk inmates housed in the Weld County Jail, a Colorado jail that has willfully disregarded public health guidelines and, in doing so, has put incarcerated people, correctional staff and the public at grave risk. COVID-19 is spreading like wildfire through the Weld County Jail, and it appears that only immediate action by this Court will change the deadly course of events unfolding there.

3.     COVID-19 is a highly contagious respiratory disease that kills between 1 and 6% of those infected: at least ten times more than the common flu that kills thousands a year.[2] The World Health Organization estimates that one in five people who become infected require hospitalization.[3] As of March 26, 2020, the United States led the world in confirmed cases of COVID-19.[4] The virus is spreading exponentially: as of April 2, 2020, there are more than 210,000

---

[1] John M. Barry, *The Single Most Important Lesson from the 1918 Influenza*, New York Times (March 17, 2020), https://cutt.ly/PtQ5uAZ (Opinion piece by author of "The Great Influenza: The Story of the Deadliest Pandemic in History," noting comparison between current COVID-19 outbreak and the 1918 influenza outbreak widely considered one of the worst pandemics in history).

[2] As of March 27, 2020, there were 622,450 confirmed cases globally, with 28,794 deaths and 135,779 recoveries. Johns Hopkins University of Medicine, *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering at Johns Hopkins University*, https://cutt.ly/StEyn2U.

[3] World Health Organization, *Q&A on Coronaviruses (COVID-19)*, *"Should I Worry About COVID-19?*," https://cutt.ly/YtEyrxl.

[4] Donald G. McNeil, Jr., *The U.S. Now Leads the World in Confirmed Coronavirus Cases*, New York Times (March 26, 2020), https://cutt.ly/QtQ7zz6.

confirmed cases in the United States.[5] Colorado is considered a new hot spot for spread of the disease, with over 5,000 confirmed cases in Colorado, nearly 1,000 hospitalizations and 150 confirmed deaths.[6] **As of April 2, it was reported that Colorado's COVID-19 death rate was rising faster than any other state.**[7]

4.      There is no vaccine or cure for COVID-19.  According to public health experts, the only course of action to slow and prevent transmission, primarily through a practice known as "social distancing," which requires all people to stay at least six feet away from all other people.[8] Indeed, the only assured way to curb the pandemic is through dramatically reducing contact for all.[9]  Consequently, every American institution—from schools[10] to places of worship,[11] from businesses[12] to legislatures[13]—has been exhorted to reduce the number of people in close quarters, if not empty entirely. These imperatives apply with special force to jails, where inmates and staff

---

[5] Centers for Disease Control and Prevention, *Coronavirus Cases in the U.S.*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html; *see also* Brittany Shammas, et al., *Trump says Quarantine for New York Area "Will not be Necessary;" U.S. Coronavirus-related Deaths Double in Two Days*, Wash. Post (March 28, 2020, 11:27 p.m.), https://cutt.ly/ktRo8u0.

[6] *See* https://covid19.colorado.gov/case-data.

[7] *See* https://www.kktv.com/content/news/Governor-says-Colorados--569337551.html.

[8] World Health Organization, *Coronavirus*, https://cutt.ly/ztWyf7e ("At this time, there are no specific vaccines or treatments for COVID-19."); *Dawnson v. Asher*, 20-cv-409 (W.D. Wash.) at Doc. No. 4, Declaration of Dr. Robert B. Greifinger, MD, ¶ 8 ("Social distancing and hand hygiene are the only known ways to prevent the rapid spread of COVID-19.").

[9] Harry Stevens, *Why Outbreaks Like Coronavirus Spread Exponentially, and how to "Flatten the Curve,"* Wash. Post. (March 14, 2020), https://cutt.ly/etYRnkz.

[10] Centers for Disease Control, *Interim Guidance for Administrators of US K-12 Schools and Child Care Programs*, https://cutt.ly/ItRPq5n.

[11] Centers for Disease Control, *Interim Guidance for Administrators and Leaders of Community- and Faith-Based Organizations to Plan, Prepare, and Respond to Coronavirus Disease 2019 (COVID-19)*, https://cutt.ly/KtRPk1k.

[12] Centers for Disease Control, *Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19)*, https://cutt.ly/stRPvg4.

[13] Nat'l Conf. of State Legislatures, *Coronavirus and State Legislatures in the News*, https://cutt.ly/4tRPQne.a

are packed together in close quarters and the government controls almost entirely a person's ability to avoid others and to maintain adequate sanitation.

5.    To comply with public health guidelines, jailers must ensure that inmates be allowed to eat, cook, sleep, use the toilet and socialize while maintaining 6 feet distance from all others.  Failure to take these actions will have serious consequences. For example, at the peak of the outbreak in Wuhan, China —the province where COVID-19 originated—over half of all reported COVID-19 cases were incarcerated people. On Rikers Island, the rate of infection among incarcerated people is over seven times the rate of infection in New York City generally, and 25 times higher than the rate in Wuhan, China.[14]

6.    Here in Colorado, prior to the pandemic, almost all jails housed incarcerated people in conditions that made physical distancing impossible, with prisoners eating, sleeping and using the toilet within a few feet of one another.  However, based on guidance from the Centers for Disease Control (CDC), the Colorado Department of Public Health and Education (CDPHE), and Governor Jared Polis, several Colorado jails have substantially decreased their jail population in an effort to make physical distancing possible and to protect high-risk inmates.[15]

7.    The Weld County Jail, however, is far behind other Colorado counties in efforts to safely lower the jail population, and current conditions in the Weld County Jail pose a serious, obvious, and emergent health and safety risk to inmates, staff and the public.  Many inmates are housed at least 3-4 to a small cell, with some cells housing as many as 9 inmates.  Until just days ago, inmates ate and recreated shoulder-to-shoulder, with no efforts at physical distancing, even as several inmates showed symptoms consistent with COVID-19.  Now, with recently confirmed

---

[15] https://www.denverpost.com/2020/04/01/colorado-jails-inmate-release-coronavirus-covid/

cases, inmates are on lockdown 23 hours per day, with some non-symptomatic inmates locked in cells with sick inmates.  Only some (but not all) very sick patients are quarantined, and the rest are left in packed cells to spread the virus to others.

8.     Rather than taking proactive measures at the start of this crisis to comply with public health guidance, Weld County Sheriff Steven Reams has openly eschewed the seriousness of the pandemic and ignored the science and data underlying public health experts' concerns regarding dangerous spread of the virus within overcrowded jails.  Not only has Sheriff Reams refused to make any meaningful efforts to depopulate his jail to allow physical distancing, he also discouraged local district attorneys and judges from making efforts to decrease the Weld County jail population, assuring them he has things under control in his jail and was ready to manage COVID-19.

9.     Given Sheriff Reams' deliberately indifferent approach to this crisis, it should come as no surprise that COVID-19 is quickly spreading within Weld County Jail.  The first confirmed cases occurred by around April 1 (and included a Weld County inmate and two Weld County sheriffs' deputies), and there now at least four confirmed cases among sheriff's deputies, multiple confirmed inmate cases, and dozens more symptomatic inmates.

10.     Sheriff Reams' failure to act to protect people who live and work in his jail is particularly egregious given the current state of affairs in Weld County. Weld County is a hot spot for the COVID-19 outbreak in Colorado, with the fourth highest number of COVID-19 infections in the state and the second highest number of deaths.[16]

---

[16] *See* https://covid19.colorado.gov/case-data.

11.     Jails are not hermetically sealed—quite the opposite.  Jail populations shift significantly each day as people are arrested and released.  The people who go in—from correctional and medical staff, to those detained prior to trial, to those serving short sentences—typically come out in very short order.  In Colorado, on average 586 people are released from jail custody every day, and about 30 people are released from Weld County Jail every day.[17]  Failing to prevent and mitigate the spread of COVID-19 endangers not only those within the institution, but the entire community. Hence, immediate and aggressive action to allow incarcerated persons and correctional staff to practice physical distancing is an essential mitigation effort that the Weld County Jail must undertake to comport with public health guidance and to prevent a catastrophic outbreak at the facility.

12.     Absent immediate intervention from this Court to align the operation of Weld County Jail with public health principles, devastating, and in many cases deadly, irreparable harm will befall incarcerated persons, jail staff, and the community.[18] The outbreaks in detention facilities around the country, many with more resources, space, and sophisticated health delivery systems than the Weld County Jail,[19] prove the need for immediate and significant reductions in population. Case-by-case review is no match for exponential spread of the disease. Courts and

---

[17] *HB 19-1297: Jail Data*, Colorado Division of Criminal Justice, https://cdpsdocs.state.co.us/ors/Data/Data_Instruments/HB1297/Dashboard/HB19-1297.html.
[18] Noam N. Levey, Jenny Jarvie, *Coronavirus Will Hit Health System Hard and Not All States are Prepared*, L.A. Times (March 12, 2020 4:00 a.m.), https://cutt.ly/mtYTI3U; Joanne Kenen, *Local Officials Alarmed by Dearth of Ventilators, Hospital Beds*, (March 14, 2020 7:00 a.m.), https://cutt.ly/stYTDDk.
[19] Sam Kelly, *134 inmates at Cook County Jail confirmed positive for COVID-19*, CHICAGO SUN-TIMES (Mar. 30, 2020). https://cutt.ly/6tYTqi5.

executive branch officials elsewhere in the country have accepted this reality and begun broad-based, categorical releases.[20]

13.     Accordingly, the named Plaintiffs—on their own behalf and for the class of high-risk persons they represent who are incarcerated at the Weld County Jail—bring this action and request that the Weld County Jail immediately comply with public health principles designed to minimize the risk of COVID-19 becoming even more widespread at the jail.

## I.     JURISDICTION AND VENUE

14.     Plaintiffs bring this class action pursuant to 42 U.S.C. § 1983 for relief from both detention and conditions of confinement that violate their Eighth and/or Fourteenth Amendment rights under the United States Constitution.

15.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331.

16.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the Defendant resides in this district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## II.     PARTIES

17.     Plaintiff Thomas Carranza is detained pretrial in Weld County jail. He is held on a $1,000 bond and facing a misdemeanor charge. He is unable to pay a financial condition of bond. Mr. Carranza is 55 years old, and he suffers from asthma. He has been hospitalized for acute

---

[20] *See, e.g.*, Memorandum and Order, *Thakker v. Doll*, No. 20-CV-0480 (M.D.Pa. Mar. 31, 2020) (categorically releasing petitioners who "suffer[] from chronic medical conditions and face[] an imminent risk of death or serious injury if exposed to COVID-19); Emmanuel Felton, *A Judge Ordered The Release Of Low-Level Prisoners Because Of The Coronavirus. People Were Absolutely Furious.*, Buzzfeed News (Mar. 27, 2020), https://cutt.ly/mtYTyxd.

asthmatic bronchitis. In the past, he was a smoker, making his respiratory condition more vulnerable. Mr. Carranza has been advised by medical providers that he has high blood pressure but has not been properly diagnosed. Mr. Carranza is also currently suffering from an undiagnosed intestinal condition causing internal bleeding and blood in his stool. Medical staff in the jail have not provided a diagnosis or treatment for this condition. As a result of his medical conditions, Mr. Carranza is particularly vulnerable to suffering severe effects from COVID. Physical distancing is critical for him. Should Mr. Carranza be released from jail, he would practice physical distancing.

18. Plaintiff Jesus Martinez is held pretrial in Weld county jail on a $10,000 bond and a parole hold. Mr. Martinez is 33 years old and suffers from multiple chronic medical conditions. He is diabetic, he has asthma and experiences shortness of breath, he has high blood pressure, and he is overweight. Mr. Martinez also had a corneal transplant in one eye and is currently experiencing discomfort and potential complications relating to this condition. As a result of his medical conditions, Mr. Martinez is particularly vulnerable to suffering severe effects from COVID. Physical distancing is critical for him. Should Mr. Martinez be released from jail, he would practice physical distancing.

19. Plaintiff Richard Barnum is 54 years old and has been held pretrial at the Weld County Jail since October 2019. Mr. Barnum intends to take his pending criminal case to trial but cannot afford the $25,000 bond to be released in the meantime. Mr. Barnum is disabled, receives social security disability benefits, and is eligible for Medicare. Mr. Barnum has untreated Hepatitis C. Prior to his arrest, Mr. Barnum was eligible for and working to obtain treatment for Hepatitis C. If he is released, he would be able to continue with that process and obtain treatment through Medicare. About five years ago, Mr. Barnum suffered major kidney failure due to stage three kidney disease. He spent one month in the hospital, which included dialysis treatment. He

continues to regularly see a doctor in Loveland CO in order to monitor his kidney issues. Mr. Barnum is a smoker who also has hypertension, PTSD and depression. As a result of his medical conditions, Mr. Barnum is particularly vulnerable to suffering severe effects from COVID. Physical distancing is critical for him. Mr. Barnum has a place to stay and to practice physical distancing if he is released from the jail. Mr. Barnum's next court date is July 1, 2020. If nothing changes, he will remain in Weld County jail until at least that time.

20.     Plaintiff Thomas Lewis is 60 years old and has been held at the Weld County jail since January 3, 2020. He was arrested on January 3, 2020 and his original bond was $8000. That bond was recently reduced to $1500, which he also cannot afford to post. Mr. Lewis' next court appearance is May 20. Thus, with no intervention, he will be in the Weld County Jail until at least that time. Mr. Lewis suffers from vitiligo, which is an immune deficiency disease. As a result of his age and medical condition, Mr. Lewis is particularly vulnerable to suffering severe effects from COVID. Physical distancing is critical for him. Should Mr. Lewis be released from jail, he would practice physical distancing.

21.     Plaintiff Michael Ward is 31 years old, and suffers from high blood pressure, arthritis, fibromyalgia, and a compromised immune system from having previously contracted West Nile virus. Mr. Ward is held pretrial at the Weld County Jail on a $10,000 bond for charges relating to a felony motor vehicle theft and several other misdemeanor charges. Mr. Ward is presumed innocent and is not convicted of any crime. As a result of his medical conditions, Mr. Ward is particularly vulnerable to suffering severe effects from COVID. Physical distancing is critical for him. Should Mr. Ward be released from jail, he would practice physical distancing.

22.     Because Plaintiffs Carranza, Martinez, Barnum, Lewis, and Ward are all being held pretrial, they have not been convicted of the alleged offense(s) for which they are being detained in the jail and are presumed innocent.

23.     Plaintiff Colby Propes has pled guilty and is awaiting sentencing.  He is being held on a $30,000 bond at the Weld County Jail and is unlikely to be released from the jail at any relevant time. Mr. Propes is 44 years old and has a long history of smoking as well as substance abuse disorders. As a result of his medical conditions and history of smoking, Mr. Propes is particularly vulnerable to suffering severe effects from COVID. Physical distancing is critical for him. Should Mr. Ward be released from jail, he would practice physical distancing.

24.     Plaintiff Chad Hunter is 46 years old and serving a 90-day jail sentence in Weld County Jail, after which he will be released on two years of probation. Mr. Hunter expects to be released on April 26, 2020. Mr. Hunter is hypoglycemic, he has a long history as a smoker, and he has a history of a substance abuse disorder. As a result of his medical conditions, Mr. Hunter is particularly vulnerable to suffering severe effects from COVID. Physical distancing is critical for him. Should Mr. Hunter be released from jail, he would practice physical distancing.

25.     Defendant Sheriff Steven Reams and his agents currently have immediate custody over the Plaintiffs and all other putative class members. Defendant Reams is a final policymaker for Weld County with respect to the customs, policies, and practices of its jail. All of Defendant Reams' actions and inactions at issue herein occurred under color of state law.

### III.      FACTUAL ALLEGATIONS

A. **COVID-19 Poses a Significant Risk of Illness, Injury, or Death**

26.    The novel coronavirus that causes COVID-19 has led to a global pandemic.[21] As of April 2, 2020, there were more than 210,000 confirmed cases in the United States alone and more than 4,500 deaths.[22] Projections indicate that as many as 240,000 people in the U.S. will die from COVID-19, accounting for existing interventions.[23]

27.    The virus is known to spread from person to person through respiratory droplets, close personal contact, fecal matter, and from contact with contaminated surfaces and objects.[24] There is no vaccine against COVID-19, and there is no known medication to prevent or treat infection.[25] Physical distancing—deliberately keeping at least six feet of space between persons to avoid spreading illness[26]—and a vigilant hygiene regimen, including washing hands frequently and thoroughly with soap and water, are the only known effective measures for protecting against transmission of COVID-19.[27]  Because the coronavirus spreads among people who do not show symptoms, staying away from people is the best way to prevent contraction.  In other words,

---

[21] Betsy McKay et al., *Coronavirus Declared Pandemic by World Health Organization*, WALL ST. J. (Mar. 11, 2020, 11:59 PM), https://cutt.ly/UtEuSLC.
[22] Centers for Disease Control and Prevention, *Coronavirus Cases in the U.S.*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html; *see also* Brittany Shammas, et al., *Trump says Quarantine for New York Area "Will not be Necessary;" U.S. Coronavirus-related Deaths Double in Two Days*, Wash. Post (March 28, 2020, 11:27 p.m.), https://cutt.ly/ktRo8u0.
[23] Rick Noack, et al., *White House Task Force Projects 100,000 to 240,000 Deaths in U.S., Even With Mitigation Efforts*, Wash. Post. (April 1, 2020, 12:02 a.m.), https://cutt.ly/5tYT7uo.
[24] Centers for Disease Control and Prevention, *Interim Infection Prevention and Control Recommendations for Patience with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings*, https://cutt.ly/ztRAo0X.
[25] *Supra* note **Error! Bookmark not defined.**.
[26] Johns Hopkins University, *Coronavirus, Social Distancing and Self-Quarantine*, https://cutt.ly/VtYYiDG.
[27] *Dawson v. Asher*, 20-cv-409 (W.D. Wash.) at Doc. No. 5, Declaration of Dr. Jonathan Louis Golob at ¶ 8.

*everyone* including officials at the Weld County Jail has to act as is if *everyone* has the disease (a point amplified by the fact that numerous people in the jail *do* have the disease).

28.    Once contracted, COVID-19 can cause severe damage to lung tissue, including a permanent loss of respiratory capacity, and it can damage tissues in other vital organs, such as the heart and liver.[28]

29.    People over the age of fifty face a greater risk of serious illness or death from COVID-19.[29] In a February 29, 2020 preliminary report, individuals age 50-59 had an overall mortality rate of 1.3%; 60-69-year-olds had an overall 3.6% mortality rate, and those 70-79 years old had an 8% mortality rate.[30]

30.    People of any age who suffer from certain underlying medical conditions, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, high blood pressure epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, and asthma, also have an elevated risk.[31] Early reports estimate that the mortality rate for those with cardiovascular disease was

---

[28] Golob Dec., *supra* note 27 at ¶ 4; *see also* Centers for Disease Control, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://cutt.ly/etRPVRl
[29] Xianxian Zhao, et al., Incidence, clinical characteristics and prognostic factor of patients with COVID-19: a systematic review and meta-analysis (March 20, 2020), https://cutt.ly/etRAkmt.
[30] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart, https://cutt.ly/ytEimUQ (data analysis based on WHOChina Joint Mission Report).
[31] *Coronavirus disease (COVID-19) advice for the public: Myth buster*s, World Health Organization, https://cutt.ly/dtEiCyc ("Older people, and people with pre-existing medical conditions (such as asthma, diabetes, heart disease) appear to be more vulnerable to becoming severely ill with the virus.").

13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[32]

31.     In many people, COVID-19 causes fever, cough, and shortness of breath. However, for people over the age of fifty or with medical conditions that increase the risk of serious COVID-19 infection, shortness of breath can be severe.[33] Most people in higher risk categories who develop serious illness will need advanced support. This requires highly specialized equipment like ventilators that are in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians.[34]

32.     In serious cases, COVID-19 causes acute respiratory disease syndrome, which is life-threatening: those who receive ideal medical care with ARDS have a 30% mortality rate.[35] Even in non-ARDS cases, COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, cause permanent loss of breathing capacity.[36] COVID-19 may also target the heart, causing a medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can reduce the heart's ability to pump.[37] This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work.

--------

[32] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization
(Feb. 28, 2020), at 12, https://cutt.ly/xtEokCt (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer").
[33] Golob Dec, *supra* note 27 at ¶ 3; Zhao, *supra* note 29.
[34] Golob Dec., *supra* note 27 at ¶ 6.
[35] Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland, March 25, 2020, https://cutt.ly/stERiXk.
[36] Golob Dec., *supra* note 27 at ¶ 7.
[37] *Id.*

33.    COVID-19 can also trigger an over-response of the immune system and result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury.[38]

34.    These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.[39]

35.    Even some younger and healthier people who contract COVID-19 may require supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.[40]

36.    The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza.[41] According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.[42] For people in the highest risk populations, the fatality rate of COVID-19 infection is about 15 percent.[43]

37.    Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurologic damage, loss of digits, and loss of respiratory capacity.[44]

---

[38] *Id.*
[39] CDC, *Interim Clinical Guidance*, *supra* note 28.
[40] Golob Dec., *supra* note 27 at ¶5.
[41] *Id.* at ¶ 4.
[42] Betsy McKay, *Coronavirus vs. Flu Which Virus is Deadlier*, WALL ST. J. (Mar. 10, 2020, 12:49 PM), https://cutt.ly/itEmi8j.
[43] Golob Dec., *supra* note 27 at ¶ 4.
[44] *Id.*

38.     Beyond the general public health presented by the COVID-19 pandemic, persons incarcerated in jails face a particularly acute threat of illness, permanent injury, and death.

B.  **Persons Incarcerated in Jails Face Grave and Immediate Danger Due to COVID-19.**

37.     People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as already evidenced by the rapid spread of the virus in cruise ships[45] and nursing homes.[46] It is virtually impossible for people who are confined in prisons, jails, and detention centers to engage in the necessary physical distancing and hygiene required to mitigate the risk of transmission. This is demonstrated by dramatic outbreaks in the Cook County Jail[47] and Rikers Island in New York City, where the transmission rate for COVID-19 is estimated to be the highest in the world.[48]

38.     Correctional settings further increase the risk of contracting COVID-19 due to the high numbers of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, presence of many high-contact non-porous surfaces, and no possibility of staying at a distance from others.[49]

---

[45] The CDC is currently recommending that travelers defer cruise ship travel worldwide. "Cruise ship passengers are at increased risk of person-to-person spread of infectious diseases, including COVID-19." *COVID-19 and Cruise Ship Travel*, Centers for Disease Control and Prevention, https://cutt.ly/7tEEQvT.
[46] The CDC notes that long-term care facilities and nursing homes pose a particular risk because of "their congregate nature" and the residents served. *Preparing for COVID-19: Long-term Care Facilities, Nursing Homes*, Centers for Disease Control and Prevention, https://cutt.ly/7tEEITH.
[47] *See supra* note 19.
[48] *Supra* note 14
[49] Letter from Johns Hopkins Faculty, *supra* note 35; *Velesaca v. Decker*, 20-cv-1803 (S.D.N.Y.) at Doc. No. 42 (March 16, 2020) (Declaration of Dr. Jaimie Meyer) (noting, *inter alia*, that jails environments have reduced prevention opportunities, increased susceptibility, and are often poorly equipped to diagnose and manage outbreaks of infection disease).

39.    Correctional facilities house large groups of people together, and move people in groups to eat, recreate, and go to court.[50] They frequently have insufficient medical care for the population even outside times of crisis.[51] Hot water, soap, and paper towels are often in limited supply. Incarcerated people, rather than professional cleaners, are responsible for cleaning the facilities[52] and often are not given appropriate supplies.

40.    Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, in which jails and prisons dealt with a disproportionately high number of cases.[53]

41.    Numerous public health experts, including Dr. Gregg Gonsalves,[54] Ross MacDonald,[55] Dr. Marc Stern,[56] Dr. Oluwadamilola T. Oladeru and Adam Beckman,[57] Dr. Anne

---

[50] *See, e.g,* Nathalie Baptiste, *Correctional Facilities are the Perfect Incubators for the Coronavirus*, (March 6, 2020), https://cutt.ly/GtRSi3e.

[51] *See, e.g.*, Steve Coll, *the Jail Health-Care Crisis*, The New Yorker (Feb. 25, 2019), https://cutt.ly/ftERHNg.

[52] *See, e.g.,* Wendy Sawyer, *How much do incarcerated people earn in each state?*, Prison Policy Initiative, (April 10, 2017); https://cutt.ly/qtER2bh (noting that "custodial, maintenance, laundry" and "grounds keeping" are among the most common jobs for incarcerated people); North Carolina Dept. of Corrections, *North Carolina Prison Inmates at Work*, https://cutt.ly/jtERCbb (noting that cleaning the grounds and facilities is one of the jobs of incarcerated persons in North Carolina).

[53] *See, e.g.,* Meyer Dec., *supra* note 49 at ¶ 19; Golob Dec., *supra* note 28 at ¶ 13. This H1N1 "swine flu" pandemic outbreak spread dramatically in jails and prisons in 2010, but that strain of virus had a low fatality rate because of the characteristics of the virus—COVID-19's fatality rate is far higher. David M. Reutter*, Swine Flu Widespread in Prisons and Jails, but Deaths are Few* (Feb. 15, 2010), https://cutt.ly/ytRSkuX.

[54] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak,* Connecticut Mirror (March 11, 2020), https://cutt.ly/BtRSxCF.

[55] Craig McCarthy and Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* New York Post (March 19, 2020), https://cutt.ly/ptRSnVo.

[56] Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington Assoc. of Sheriffs & Police Chiefs (March 5, 2020), https://cutt.ly/EtRSm4R.

[57] Oluwadamilola T. Oladeru, et al., *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind*, (March 10, 2020), https://cutt.ly/QtRSYNA.

Spaulding,[58] Homer Venters,[59] Jaimie Meyer,[60] the faculty at Johns Hopkins schools of nursing, medicine, and public health,[61] and Josiah Rich[62] have all strongly cautioned that people booked into and held in jails are likely to face serious, even grave, harm due to the outbreak of COVID-19.

C. **Existing Procedures and Protocols at the Weld County Jail Are Not Sufficient to Ensure the Safety of the Plaintiffs, Class Members or the General Public**

42.     Because of the severity of the threat posed by COVID-19, and its potential to rapidly spread throughout a correctional setting, public health experts recommend the rapid release from custody of people most vulnerable to COVID-19.[63] Release protects the people with the greatest vulnerability to COVID-19 from transmission of the virus, and also allows for greater risk mitigation for people held or working in a jail and the broader community.[64] Release also reduces the burden on the region's health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time.  It is

---

[58] Anne C. Spaulding, MD MPDH, *Coronavirus COVID-19 and the Correctional Jail,* Emory Center for the Health of Incarcerated Persons (March 9, 2020).

[59] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, Mother Jones (March 12, 2020), https://cutt.ly/jtRSPnk.

[60] Meyer Dec., *supra* note 49.

[61] *See,* supra note 35.

[62] Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons*, The Guardian (March 13, 2020 3:00 p.m.), https://cutt.ly/itRSDNH.

[63] *See* Meyer Dec., *supra* note 49 at ¶¶ 37–38 (noting that population reduction in jails will be "crucially important to reducing the level of risk both for those within [jail] facilities and for the community at large," and that stemming the flow of intakes is a part of the necessary intervention); Greifinger Dec., *supra* note **Error! Bookmark not defined.** at ¶ 13 ("In my opinion, the public health recommendation is to release high-risk people from detention, given the heightened risks to their health and safety, especially given the lack of a viable vaccine for prevention or effective treatment at this stage."); *Dawson v. Asher*, 20-cv-409 (W.D. Wash.) at Doc. No. 6, Declaration of Marc Stern at ¶¶ 9–10 (noting that release is "a critically important way to meaningfully mitigate" the risks of harm to persons who are at high risk of serious illness or death, as well as to support the broader community health infrastructure).

[64] *Id.*

for these reasons that, in late March 2020, the Governor took executive action specifically urging that broad decarceration of county jails was necessary to mitigate the spread of COVID-19.[65]

43.    Public health guidance put all sheriffs on notice of the dire risk of the spread of COVID-19 through jails without substantial changes to the jail environment. Additionally, on March 26, 2020, Sheriff Reams received a letter from the ACLU providing public health information regarding the dangers of the spread of the virus in jails, as well as the societal and constitutional obligation of jailers to allow prisoners, and particularly those in the high risk population, to practice physical distancing at all times in the jails. Attached to the ACLU letter was a letter from infectious disease expert at University of Colorado Anschutz which made clear that, to protect inmates, they must be housed in a manner that allows them to sleep, socialize and eat while maintain a six foot distance from others. Dr. Franco-Paredes explained:

> To contain the spread of the disease, infection prevention protocols must be meticulously followed. These infection prevention protocols include "social distancing" measures, where individuals maintain a distance of at least six feet from each other and frequent hand-washing and other good hygiene practices. . . . In a carceral setting, these protocols would require, for example, that individuals sleep one person per cell, rather than in bunk beds.

44.    Despite being aware of likely COVID-19 infection in the jail, Defendant Reams failed to act promptly and took almost no precautionary measures for weeks after COVID-19 was spreading through Colorado. As a result of these failures, at least one inmate and f staff tested positive for Covid-19 by no later than April 1, 2020. The infected inmate had been at the jail for over a year; so, it is likely that there is internal spread within the jail. More recent reports indicate that multiple inmates and at least four deputies have tested positive with dozens more inmates

---

[65] *Available at* https://drive.google.com/file/d/1q7wkqi-NeU5nmuFcBQwn-6CryTKdYJ5P/view ("Reducing the numbers of those arrested or incarcerated is vital to our efforts to limit and prevent the spread of COVID-19 in our communities, detention centers and prisons.").

showing symptoms consistent with COVID-19. The infection is now almost certainly widespread in the Weld County Jail.

45. Weld County is the sixth most populous jail in Colorado. Of the ten most populous Colorado jails, **Weld County Jail stands out as having the lowest depopulation rate since the start of the COVID-19 crisis and the highest jail occupancy rate.**

46. Unlike many other Colorado sheriffs, Defendant Sheriff Reams has refused to take the public health risk or data seriously.

47. Defendant Reams has scoffed at Gubernatorial guidance and actions by the Department of Corrections to decarcerate.[66] He has even posted a "Get out of Jail Free Card" from the child's board game Monopoly to underscore his disagreement with actions to depopulate jails in order to allow physical distancing.[67] Defendant Reams has further boasted that, despite all public health recommendations to the contrary, he can manage the virus without releasing inmates.[68]

48. Defendant Reams' deliberate indifference to the reality of this crisis is particularly alarming given the current state of affairs in Weld County. Weld County is a hot spot for the COVID-19 outbreak in Colorado. As of April 6, 2020, it has the fourth highest number of infections and the fifth highest concentration of infections by population compared to all other

---

[66] *See, e.g.*, https://coloradotimesrecorder.com/2020/03/weld-sheriff-id-rather-take-my-risk-with-the-virus-than-socialism/22199/.
[67] *See* https://www.facebook.com/SteveReamsForWeldCountySheriff/posts/1524469844396739
[68] *Id.* ("I haven't closed the Weld County Jail nor have I started releasing prisoners because of the Covid 19 virus; and I don't intend to do so. The Weld County Jail has very competent and effective medical staff to handle this crisis and we will work closely with the Weld County Health Department to get through these tough times if the need arises.").

counties.[69] **With 24 COVID-19 related deaths as of April 6, Weld County has the second highest number of deaths compared to any other county in the state, surpassing Denver**.[70]

49.     The failure to act to substantially reduce the Weld County Jail inmate population is alarming given the county-wide infection rate and death rate. Weld County correctional staff work mostly in the Weld County, daily interacting with inmates in a crowded environment and then returning home to their families. And, of course, Weld County inmates are commonly released to the community, with an average of about 30 released inmates per day. There is no line, thin or otherwise, between the health of Weld County inmates, the health of Weld County correctional staff, and the health of Weld County as a whole.

50.     Defendant Reams has demonstrated throughout this crisis an unwillingness or inability to safely care for people in his custody. For weeks, Defendant Reams cavalierly refused to take any apparent precautions whatsoever within the facility. No testing for COVID-19 of people suffering from apparent COVID-19 symptoms occurred, no physical distancing occurred, and inadequate sanitation was widespread.

51.     Recently, on or about April 1—and only after the outbreak of COVID-19 in the facility evidenced by the positive tests—Defendant Reams suddenly implemented a 23-hour a day lockdown of detainees and inmates in their cells, with only 1 hour per day out. This Draconian measure not only comes too little too late, the crowded cells and shared spaces make it impossible to safely house people without spreading disease.

52.     Currently, people are still held in pods of 40 or more individuals, with at least 3-4 people to a cell (and in some cases as many as 9 in a cell). Within each cell, the numerous people

---

[69] https://covid19.colorado.gov/case-data
[70] *Id*.

housed therein cannot maintain adequate physical distance and will inevitably infect each other

with COVID-19. Moreover, during the 1 hour per day they are permitted out, two cells are let out

at a time, for up to 12 (sometimes more) people congregating in a common area. Adequate

distancing and sanitation remain impossible. Additionally, throughout the day, even those

individuals on lockdown are permitted to leave their cells to use the shared toilet, go to medical,

use the phones, and other limited purposes. Thus, at any given time in the common area 15 or more

people still congregate, stand and walk in close proximity, touch the same surfaces, and cannot

maintain adequate distance.

53.     A typical pod shares about 4 toilets total, 2 on each floor of the pod. So, for a pod

of 40-50 men, all 40-50 of them use 4 toilets to defecate, one after another throughout the day.

They use the same sink and bathroom area, touch the same surfaces, use the same hand railings,

sit on the same toilets, touch the same dispensers, and pass each other in close proximity. Often,

they run out of soap and are unable even to wash their hands after using the toilet. Because COVID-

19 spreads through fecal matter as well as saliva, these crowded conditions and shared spaces make

it impossible for inmates to maintain safe sanitation or distancing.  The design and operation of

the jail do not allow for physical distancing and, in fact, fail to meet the public health guidelines

set by the Centers for Disease Control (CDC) and the Colorado Department of Public Health and

Education (CDPHE).

54.     In pods of 40-60 individuals, as many as half are displaying potential COVID-19

symptoms, yet very few have been tested for the virus. Meanwhile, multiple sick people have

tested negative for the flu, even more strongly suggesting they may be infected with COVID-19.

55.     Alarmingly, jail officials are not removing sick people out of the communal pods

unless they have at least 4 symptoms. In at least the A Pod, jail personnel wrote on a poster that

you have to have coughing, fever, sore throat, etc. (at least 4 symptoms) to be pulled out of the
pod and presumably quarantined.

56.     Also alarming, in the kitchen, inmate workers have been displaying symptoms
consistent with COVID-19. Given that the jail feeds approximately 600 people held in custody,
sick kitchen workers handling food and distributing trays means the entire facility may be exposed
and infected. Yet, **none of the inmates who work in the kitchen are even being provided masks**.

57.     Inmates have requested masks but the jail has refused to provide them. Moreover,
when some inmates have worn homemade masks or put towels around their face in an attempt to
protect themselves, jail staff have instructed them to stop and remove the masks. The jail is not
only failing to provide masks, it is actively preventing people from wearing them or taking other
precautions.

58.     Furthermore, the jail is failing to adequately educate inmates or to provide access
to up to date information about COVID-19, making precautions even more difficult to achieve.
The jail has failed to educate inmates on appropriate sanitation precautions, physical distancing,
the importance of wearing masks (which, as alleged above, it is in fact preventing inmates from
wearing), how the virus spreads, how it affects the body, or other basic medical information that
is necessary for the community within the jail to protect itself. The jail has also sought to cut off
inmate access to public news reports about COVID-19. Inmates have been left effectively in the
dark as Defendant Reams and the jail have failed to protect them.

59.     Additionally, the jail is not taking adequate precautions to protect vulnerable people
or to quarantine people with symptoms. For instance, a detainee who was recently booked into the
jail has moderate to severe asthma, which places him at higher risk of fatality if he were to contract
the virus. This individual was held in Weld County Jail booking and not given his asthma

medication. While held in booking without his medication, he suffered an asthma attack. His

cellmates worked to try to keep him calm throughout this asthma attack as it took a very long time

for medical personnel to arrive. When they finally arrived, the detainee told them that in addition

to his asthma attack he was also coughing. In response, the medical personnel in the Jail advised

him that he "probably just had a cold" and took no further steps to attempt to isolate him from the

general jail population or to determine if he might have the COVID-19 virus.

60.     The jail has failed to adequately protect any of the named Plaintiffs, including but

far from limited to physical distancing at all times.

61.     Therefore, the jail is, with deliberate indifference, failing to take adequate

precautions to avoid the spread of potential COVID-19 in the facility, and the operation of the jail.

The jail is instead deliberately indifferently facilitating the spread of the disease. In fact, it is hard

to envision more ideal conditions for the spread of COVID-19. Of particular concern, some of the

sick individuals, as well as other not yet visibly ill inmates, fall into the category of high-risk of

critical illness and mortality from COVID-19 according to CDC guidelines.

62.     The Weld County Jail must respond to and manage the continued risk of harm

posed by the COVID-19 outbreak by following CDC[71] and other public health guidelines. This

requires, among other things: (a) physically distancing all inmates from one another and staff

within the Weld County Jail, which necessitates at least six feet of distance between individuals at

all times; (b) on a daily basis, thoroughly and professionally disinfecting and sanitizing the Weld

County Jail; (c) providing hygiene supplies, including supplies to wash hands and disinfect

---

[71] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus
Disease 2019 (COVID-19) in Correctional and Detention Facilities*,
https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-
correctional-detention.html.

common areas, to inmates at all times and free of charge; (d) providing personal protective equipment, including but not limited to masks, to all staff members and inmates; (e) taking particularly heightened precautions with respect to food handling and delivery, such as ensuring that people who come into contact with food are not displaying any potential symptoms of COVID-19, have not recently been in contact with people displaying potential symptoms of COVID-19, and people who come into contact with food wear appropriate personal protection at all times when in contact with food (including but not limited to appropriate masks and gloves); (f) implementing appropriate policies and protocols to identify inmates who are possibly carrying COVID-19 and quarantine those inmates from other individuals; and (g) providing accurate, up-to-date educational and informational materials regarding sanitation and prevention of COVID-19, the status of how COVID-19 is affecting the facility including the number of infected inmates and staff, and daily access to news reports regarding COVID-19.

63.    Finally, Plaintiffs have fully exhausted all administrative remedies available to them.

## IV.    CLASS ACTION ALLEGATIONS

64.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedures on behalf of themselves and a class of similarly situated individuals.

65.    As explained more fully in Plaintiffs' motion for class certification, Plaintiffs seek certification of the following class of individuals:

All current and future persons held at the Weld County Jail who are at high risk of complications from COVID-19 because:

(a) they are age 55 or older; or

(b) they have the following chronic health conditions:  cancer; autoimmune disease (including lupus, rheumatoid arthritis, psoriasis, Sjogren's, Crohn's); chronic lung disease (including asthma, chronic obstructive

pulmonary disease, bronchiectasis, idiopathic pulmonary fibrosis or other chronic conditions associated with impaired lung function); history of cardiovascular disease; chronic arthritis; chronic liver or kidney disease; diabetes; hypertension; heart failure; HIV; on chronic steroids or other immunosuppressant medications for chronic conditions;

(c) they have history of smoking or other substance abuse disorders; or

(d) they are pregnant.

66.    Class certification is proper under Federal Rule of Civil Procedure 23(a) if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). This is further explained in Plaintiffs' motion for class certification.

67.    In addition, the proposed class must be certifiable under one of the three sub-provisions of Rule 23(b). Here, Plaintiffs seek certification under Rule 23(b)(2), because the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.  Fed. R. Civ. P. 23(b)(2). This is further explained in Plaintiffs' motion for class certification.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Unconstitutional Conditions of Confinement in Violation of the Fourteenth Amendment to the U.S. Constitution**
42 U.S.C. § 1983
*Plaintiffs Carranza, Martinez, Barnum, Lewis, Ward and the Class They Represent*

68.    Under the Fourteenth Amendment, corrections officials are required to provide for the reasonable health and safety of persons in pretrial custody. *Youngberg v. Romeo*, 457 U.S. 307,

315–16, 324 (1982) (the state has an "unquestioned duty to provide adequate . . . medical care" for detained persons).

69.    As part of the right, the government must provide incarcerated persons with reasonable safety and address serious medical needs that arise in jail to at least the same degree of persons in custody subsequent to a conviction. Deliberate indifference to the serious risk COVID-19 poses to Plaintiffs and members of the Class violates this right.

70.    The Weld County Jail has unconstitutionally failed to comply with public health guidelines to prevent or manage an outbreak of COVID-19 and unconstitutionally failed to provide for the safety of the individually named Plaintiffs and the Class. Defendant's actions and inactions result in the confinement of these Plaintiffs and Class members people in a jail where their rights to reasonably safe conditions of confinement and adequate medical care are being violated.

71.    Accordingly, Defendant Reams, as a supervisor, direct participant, and policy maker for Weld County has violated the rights of Plaintiffs and the Class under the Fourteenth Amendment.

**SECOND CLAIM FOR RELIEF**

**Unconstitutional Conditions of Confinement in Violation of the Eighth Amendment to the U.S. Constitution**
42 U.S.C. § 1983
*Plaintiffs Propes, Hunter, and the Class They Represent*

72.    Under the Eighth Amendment, persons in carceral custody have a right to be free from cruel and unusual punishment. As part of the right, the government must provide incarcerated persons with reasonable safety and address serious medical needs that arise in jail. *See, e.g., Estelle*, 429 U.S. at 104; *DeShaney*, 489 U.S. at 200. Deliberate indifference to the serious risk COVID-19 poses to Plaintiffs and the members of Class infringes on the protection from cruel and

unusual punishment. Defendant violates this right by subjecting members of the Class and Plaintiffs Propes and Hunter to conditions of confinement that do not ensure their safety and health.

73.    The Weld County Jail has unconstitutionally failed to comply with public health guidelines to prevent or manage an outbreak of COVID-19 and unconstitutionally failed to provide for the safety of Plaintiff Propes, Hunter, and the Class. Defendant's actions and inactions result in the confinement of these Plaintiffs and the Class in a jail where their rights to reasonably safe conditions of confinement and adequate medical care are being violated.

74.    Accordingly, Defendant Reams, as a supervisor, direct participant, and policy maker for Weld County has violated the rights of Plaintiffs and the Class under the Eighth Amendment.

## VI.    REQUEST FOR RELIEF

75.    Plaintiffs, for themselves and for the members of the proposed Class, respectfully request that the Court order the following:

1. Certification of this action as a Class Action;

2. A temporary restraining order, preliminary injunction, and/or permanent injunction requiring Defendant to:

   a. Physically distance all inmates from one another and staff within the Weld County Jail, which necessitates at least six feet of distance between individuals at all times;

   b. On a daily basis, thoroughly and professionally disinfect and sanitize the Weld County Jail;

   c. Provide hygiene supplies, including supplies to wash hands and disinfect common areas, to inmates at all times and free of charge;

    d.   Provide personal protective equipment, including but not limited to masks, to all staff members and inmates;

    e.   Take particularly heightened precautions with respect to food handling and delivery, such as ensuring that people who come into contact with food are not displaying any potential symptoms of COVID-19, have not recently been in contact with people displaying potential symptoms of COVID-19, and people who come into contact with food wear appropriate personal protection at all times when in contact with food (including but not limited to appropriate masks and gloves);

    f.   Implement appropriate policies and protocols to identify inmates who are possibly carrying COVID-19 and quarantine those inmates from other individuals; and

    g.   provide accurate, up-to-date educational and informational materials regarding sanitation and prevention of COVID-19, the status of how COVID-19 is affecting the facility including the number of infected inmates and staff, and daily access to news reports regarding COVID-19.

3. A declaration that jail's policies violate the Fourteenth Amendment rights to reasonable safety and to be free from punishment prior to conviction;

4. A declaration that jail's policies violate the Eighth Amendment right against cruel and unusual punishment;

5. An award of Plaintiffs' attorney fees and costs under 42 U.S.C. sec. 1988 and other applicable law; and

6. Any further relief this Court deems appropriate.

Dated: April 7, 2020

Respectfully submitted,

s/ *Andy McNulty*

Andy McNulty
Michael P. Fairhurst
David A. Lane
Darold W. Killmer
KILLMER, LANE & NEWMAN, LLP
1543 Champa St. Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001 Facsimile
amcnulty@kln-law.com
mfairhurst@kln-law.com
dlane@kln-law.com
dkillmer@kn-law.com

*and*

David G. Maxted
Maxted Law LLC
1543 Champa Street Suite 400
Denver, CO 80202
Phone: 720-717-0877
Fax: 720-500-1251
dave@maxtedlaw.com

*and*

Jamie Hughes Hubbard
STIMSON STANCIL LABRANCHE HUBBARD, LLC
Phone:  720.689.8909
Email:  hubbard@sslhlaw.com

*Counsel for Plaintiffs Carranza, Martinez, Propes, and Hunter*

Mark Silverstein
Rebecca T. Wallace
Sara R. Neel
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF COLORADO
303 E. 17th Avenue, Suite 350
Denver, Colorado 80203
(720) 402-3114
msilverstein@aclu-co.org

29

rtwallace@aclu-co.org
sneel@aclu-co.org

*and*

Daniel D. Williams
Lauren E. Groth
HUTCHINSON BLACK AND COOK, LLC
921 Walnut Street, Suite 200
Boulder, Colorado 80302
(303) 442-6514
Williams@hbcboulder.com
Groth@hbcboulder.com
*In cooperation with the ACLU Foundation of Colorado*

*Counsel for Plaintiffs Barnum and Lewis*