IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-00977-PAB

THOMAS CARRANZA;
JESUS MARTINEZ;
RICHARD BARNUM;
THOMAS LEWIS;
MICHAEL WARD;
COLBY PROPES; and
CHAD HUNTER,

      Plaintiffs, on their own and on behalf of a class of similarly situated persons,

v.

STEVEN REAMS, Sheriff of Weld County, Colorado, in his official capacity,

      Defendant.

---

## DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED HEARING [ECF 1]

---

      Defendant Sheriff Steven Reams ("Sheriff"), the elected Sheriff for the County of Weld, State of Colorado, by and through counsel, Matthew J. Hegarty, Esq., Andrew D. Ringel, Esq., and John F. Peters, Esq., of Hall & Evans, L.L.C., submits his Response to Plaintiffs' Motion for Temporary Restraining Order ... and Expedited Hearing [ECF 1] and requests Plaintiffs' Motion be denied in its entirety,[1] as follows:

---

[1] In compliance with the Court's April 8, 2020, Minute Order, the Sheriff responds to ECF 1 only insofar as it seeks a temporary restraining order and expedited hearing. The Sheriff reserves the right to respond further to the Motion insofar as it seeks a preliminary injunction. This Response was filed before April 13, 2020, at 9:00 AM MDT.

## I. <u>INTRODUCTION AND SUMMARY</u>

ECF 1, Plaintiffs' Motion for Temporary Restraining Order ... and Expedited Hearing ("Motion") asks this Court to serve as the Keeper of the Weld County Jail instead of its elected Sheriff.  While the current pandemic brought on by the novel coronavirus ("COVID-19") presents unprecedented challenges for all Americans, no basis exists for this Court to depart from the applicable law governing granting the type of mandatory and systemic injunctive relief Plaintiffs demand from the Sheriff of Weld County. This Court's evaluation of the facts presented in this Response must be undertaken against the background of the applicable law set forth in this Response. A myriad of legal, factual, and practical barriers exist to the wholesale relief Plaintiffs seek from this Court.

Since the outset of the COVID-19 pandemic, the Sheriff and his deputies have worked hard to determine an appropriate response that sufficiently advances all the different applicable interests—the need to operate the Weld County Jail; the need to protect the safety and health of inmates, detainees, and staff; and the need to protect the public of Weld County and Colorado. As set forth in the Sheriff's Declaration that accompanies this Response, the Sheriff and his staff have engaged and continue to engage in ongoing efforts to meet all of these goals. The Sheriff and undersigned counsel strongly believe any review of the totality of the Sheriff's efforts and of the Weld County Sheriff's Office's efforts demonstrate appropriate steps have been taken from a wide variety of angles to protect all applicable interests. To the extent any areas of improvement can be identified, the Sheriff welcomes the input of everyone to continue to improve all aspects of the operations of the Weld County Jail. At its bottom, the issue

before this Court is not whether the Sheriff has been able to adopt any specific aspect of the Centers for Disease Control guidelines adopted generally for the entire United States and not specifically suited for the unique circumstances of a correctional facility.  Instead, the issue this Court must determine is whether Plaintiffs' constitutional rights have been violated. Fundamentally, based on the entire record before this Court as set forth in this Response, the short answer (and the full answer) to that fundamental question is, "*No.*"

For the below reasons, Plaintiffs' claims are moot, and Plaintiffs' effort suffers from crippling procedural and substantive infirmities. Plaintiffs are thus unable to satisfy the heightened burden necessary to attain injunctive relief at this juncture. Plaintiffs' Motion for Temporary Restraining Order ... and Expedited Hearing must be denied in its entirety.

## II.  RESPONSE TO PLAINTIFFS' STATEMENT AS TO NOTICE TO DEFENDANT

The Sheriff's counsel disagrees with Plaintiffs' statement in their "Notice to Defendant." The Sheriff's counsel did not "indicate[] that Defendant opposes the relief sought herein." [ECF 1, at 28]. Rather, counsel for the Sheriff conferred extensively with counsel for Plaintiffs before Plaintiffs filed ECF 1 and counsel were still in the process of conferring when ECF 1 was filed. Nevertheless, upon review of the as-filed version of ECF 1, and for the reasons stated below, the Sheriff's counsel states ECF 1 is opposed.

## III.  COUNTER-STATEMENT OF FACTS

Filed with this Response is the Declaration of Sheriff Steven Reams, Defendant. [*See* Decl. of Sheriff Steven Reams, **Exhibit A**]. The Sheriff's Declaration, along with an dossier of attachments comprising emails, protocols, and other documents substantiating the Declaration's contents, sets forth the comprehensive and sustained effort the Weld

County Sheriff's Office ("WCSO"), under the Sheriff's leadership, has brought to bear to address the COVID-19 pandemic and its impact on the operations of the Weld County Jail ("WCJ") and to ensure inmate health and safety as much as reasonably practicable. Beginning in late February 2020, the Sheriff and the WCSO have taken substantial steps to generate, implement, and refine the policies and protocols of the WCSO to address the COVID-19 pandemic. WCSO protocols and processes incorporated national guidelines from the Centers for Disease Control ("CDC"), state directives from the Colorado Department of Public Health and Environment ("CDPHE"), and local information and guidance from the Weld County Health Department ("WCHD"). All decisions made by the Sheriff and the WCSO and adopted at the WCJ related to the COVID-19 pandemic have been made based on an assessment of the health and safety needs of the inmates, WCSO employees, and the public. All decisions made by the Sheriff and the WCSO and adopted at the WCJ related to the COVID-19 pandemic also were made based on distinct operational needs of a jail, the physical plant, structure, and layout of WCJ, and the resources and supplies available to the WCSO. The Sheriff and the WCSO persist in evaluating and responding to the different events which occurred since before COVID-19 became an issue for the WCSO generally and at the WCJ specifically and will continue to do so. [*See* Sheriff Decl., **Exh. A**, ¶ 6].

Rather than set forth the details of the Sheriff's and the WCSO's response as included in the Sheriff's Declaration, the Court is referred to the Declaration and specific references in the argument below are made to the Declaration as appropriate.

## IV.  <u>STANDARD OF REVIEW</u>

Plaintiffs incorrectly state the standard for a temporary restraining order ("TRO") or other injunctive relief, as relevant to the relief Plaintiffs request. Injunctive relief is an extraordinarily drastic remedy and is granted only in cases where the right to relief is clearly established. *See **Goldammer v. Fay***, 326 F.2d 268, 270 (10th Cir. 1964). The movants bear the burden to establish their right to relief. ***Penn v. San Juan Hospital, Inc.***, 528 F.2d 1181, 1185 (10th Cir. 1975). Further, "[TROs] and preliminary injunctions differ in how long they can last. Temporary restraining orders can last no more than fourteen days; preliminary injunctions can last longer. When a temporary restraining order lasts longer than fourteen days, it becomes appealable as a preliminary injunction. This is true even if the district court labels its order a temporary restraining order." ***Tooele Cnty. v. United States***, 820 F.3d 1183, 1187 (10th Cir. 2016) (footnote omitted) (citation omitted) (concluding District Court violated Anti-Injunction Act by issuing injunctive relief which had effect of enjoining state court proceedings).

The Sheriff agrees that to obtain a TRO (as with a preliminary injunction), Plaintiffs must prove four elements: (1) they will suffer irreparable injury unless the relief issues; (2) the threatened injury outweighs whatever damages the relief might cause the Sheriff's ability to operate the WCJ; (3) such injunctive relief will not be adverse to the public interest; and (4) Plaintiffs have a substantial likelihood of succeeding on the merits of their case. ***Schrier v. Univ. of Colo.***, 427 F.3d 1253, 1258 (10th Cir. 2005) (affirming denial of injunctive relief); ***Little v. Jones***, 607 F.3d 1245, 1251 (10th Cir. 2010) (same).

Injunctive relief is "extraordinary" and should not issue unless the right to relief is "clear and unequivocal." ***Kikumura v. Hurley***, 242 F.3d 950, 955 (10th Cir. 2001).

Plaintiffs next argue, however, that "where the moving party has established that the three 'harm' factors tip decidedly in its favor, the 'probability of success' requirement is relaxed[.]" [ECF 1, at 30 (quoting ***Star Fuel Marts, LLC v. Sam's East, Inc***., 362 F.3d 639, 652-53 (10th Cir. 2004)]. This is the wrong standard. Rather, in these circumstances, Plaintiffs labor under a "heightened burden" for injunctive relief, a burden imposed where the sought-after relief: (1) disturbs the status quo; (2) is mandatory instead of prohibitory; or (3) affords the movant substantially all the relief it may recover after a full merits trial. ***SCFC ILC, Inc. v. VISA USA, Inc.***, 936 F.2d 1096, 1098-99 (10th Cir. 1991); *accord* ***O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft***, 389 F.3d 973, 975 (10th Cir. 2004) (en banc) ("***O Centro***"), *aff'd on other grounds sub nom.*, ***Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal***, 546 U.S. 418 (2006); *see also* ***In re HomeAdvisor, Inc. Litig.***, 2019 U.S. Dist. LEXIS 141984, at *11-14 (D. Colo. Aug. 20, 2019) (Brimmer, C.J.) (discussing whether injunction disturbs status quo or is mandatory). Plaintiffs "must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms, and may not rely on our modified likelihood-of-success-on-the-merits standard." ***O Centro***, 389 F.3d at 976. This is so because "[s]uch disfavored injunctions 'must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course.'" ***Schrier***, 427 F.3d at 1259 (quoting ***O Centro***, 389 F.3d at 975).

First, the "status quo" is not defined by "the parties' existing legal rights," but by "the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights." ***SCFC ILC***, 936 F.2d at 1100. Second, mandatory injunctions are more burdensome than prohibitory ones because they compel the nonmovant to act affirmatively in a particular way, and hence necessitate potential ongoing supervision to assure the nonmovant is abiding by the injunction. ***Id.*** at 1099. Third, injunctive relief awarding the movants substantially all the relief to which they may be entitled if it succeeded on the merits echoes the "Sentence first, Verdict Afterwards" procedure parodied in Alice in Wonderland, anathema to the American system of jurisprudence. *See id.* at 1099 & n.4. Here, Plaintiffs ask this Court to immediately order the Sheriff and the WCJ to put in place numerous requirements, or alternatively, begin the wholesale release of those incarcerated and detained in the WCJ. Plaintiffs' requested injunctive relief requires the Sheriff to take affirmative action, making the injunctive relief quintessentially mandatory. Clearly, the requested relief fundamentally would alter the status quo. Among other relief, Plaintiffs ask this Court to order the Sheriff and the WCJ "be required to physically distance all inmates from one another and staff within the [WCJ]" or "alternatively ask this Court to order the transfer of a sufficient number of inmates to electronic home monitoring to allow for appropriate physical distancing within the Weld County Jail." [ECF 1, at 6-7]. This extraordinary request alters the status quo, either by changing the bond conditions or sentences of dozens to hundreds of inmates,

which the Sheriff has no power to do under state law,[2] or by requiring the Sheriff to put in place directives to WCJ deputies to forcefully ensure compliance with social distancing.[3]

Fourth, Plaintiffs ask the Court to immediately order the full relief sought in the Complaint, before any discovery, trial, or dispositive briefing. For all of these reasons, Plaintiffs must meet the heightened standard for disfavored injunctive relief.

Finally, Plaintiffs' demand for injunctive relief is not only subject to the heightened standard of a mandatory injunction. It is also subject to the limitations and requirements of the Prison Litigation Reform Act of 1995 ("PLRA") discussed at length below.

Hence, this Court must subject Plaintiffs' application for injunctive relief to the extraordinary scrutiny it warrants under the circumstances of this case.

## V. ARGUMENT

Several substantive and fully applicable statutes and bodies of caselaw, some of which are conspicuously absent from Plaintiffs' Motion, must inform the Court's decision on the propriety of granting the sought-after injunctive relief which would come with a

---

[2] As discussed later in this Response, the Court lacks the authority to change inmates' bond conditions and sentences, as only Colorado state courts have jurisdiction over bond conditions and sentences of WCJ inmates; this is not a habeas corpus action but a 42 U.S.C. § 1983 action; and federal courts lack authority to enjoin state courts through a § 1983 action in most circumstances, based on the plain terms of § 1983.

[3] Plaintiffs have not given this Court any direction for how the Sheriff could enforce social distancing in the WCJ. Would the Court authorize all necessary force to maintain a six-foot distance between all inmates at all times even in the face of inmate refusal? Would tasers be permitted if inmates refused to socially distance? Could any inmate who refused be put in indefinite solitary confinement? Would deputies acting under the Court Order to ensure social distancing be immune from suit alleging excessive force in ensuring compliance with the Order? As such, Plaintiffs' request to ensure social distancing opens a Pandora's Box of legal conundrums and § 1983 claims, none of which Plaintiffs appear to have considered.

TRO and expedited hearing. When those substantive and fully applicable legal principles are applied to the true and correct timeline and factual scenario presented with this Response, it is apparent Plaintiffs cannot satisfy any of the four elements necessary to grant injunctive relief. Thus, this Court should deny the Motion and should preclude issuance of the sought-after injunctive relief and expedited hearing.

## A.  The Prison Litigation Reform Act Both Governs and Limits Plaintiffs' Claims

Plaintiffs omit any mention of the PLRA or the impact of the PLRA on their claims and claimed entitlement to injunctive relief against the Sheriff.

Plaintiffs' claims inarguably are subject to the PLRA. *See, e.g.*, **Wolfson v. United States**, 336 F. App'x 792, 794-95 (10th Cir. 2009) ("prisoner" in PLRA includes individuals accused of criminal law violations and those sentenced criminally); 42 U.S.C. § 1997e(h) (defining "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program").

The PLRA "imposes limits on the scope and duration of preliminary and permanent injunctive relief." **Nelson v. Campbell**, 541 U.S. 637, 650 (2004). The "new standards for injunctive and prospective relief" provided by the PLRA underscores the fact "the PLRA 'strongly disfavors continuing relief through the federal courts; indeed, its fundamental purpose [is] to extricate them from managing state prisons.'" **Porter v. Graves**, 597 F. App'x 964, 967 (10th Cir. 2014) (quoting **Guajardo v. Tex. Dep't of Crim. Justice**, 363 F.3d 392, 394 (5th Cir. 2004)). Specifically, the PLRA provides the following requirements from Congress which governs TROs and both preliminary and permanent injunctive relief:

(a) Requirements for relief.

(1) Prospective relief.

> (A) Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

> (B) The court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless—

>> (i) Federal law requires such relief to be ordered in violation of State or local law;

>> (ii) the relief is necessary to correct the violation of a Federal right; and

>> (iii) no other relief will correct the violation of the Federal right.

> (C) Nothing in this section shall be construed to authorize the courts, in exercising their remedial powers, to order the construction of prisons or the raising of taxes, or to repeal or detract from otherwise applicable limitations on the remedial powers of the courts.

(2) Preliminary injunctive relief. In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings

required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

(3) Prisoner release order.

> (A) In any civil action with respect to prison conditions, no court shall enter a prisoner release order unless—

>> (i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and

>> (ii) the defendant has had a reasonable amount of time to comply with the previous court orders.

> (B) In any civil action in Federal court with respect to prison conditions, a prisoner release order shall be entered only by a three-judge court in accordance with section 2284 of title 28, if the requirements of subparagraph (E) have been met.

> (C) A party seeking a prisoner release order in Federal court shall file with any request for such relief, a request for a three-judge court and materials sufficient to demonstrate that the requirements of subparagraph (A) have been met.

> (D) If the requirements under subparagraph (A) have been met, a Federal judge before whom a civil action with respect to prison conditions is pending who believes that a prison release order should be considered may sua sponte request the convening of a three-judge court to determine whether a prisoner release order should be entered.

> (E) The three-judge court shall enter a prisoner release order only if the court finds by clear and convincing evidence that—

>> (i) crowding is the primary cause of the violation of a Federal right; and

>> (ii) no other relief will remedy the violation of the Federal right.

> (F) Any State or local official including a legislator or unit of government whose jurisdiction or function includes the appropriation of funds for the construction, operation, or maintenance of prison

> facilities, or the prosecution or custody of persons who may be released from, or not admitted to, a prison as a result of a prisoner release order shall have standing to oppose the imposition or continuation in effect of such relief and to seek termination of such relief, and shall have the right to intervene in any proceeding relating to such relief.

18 U.S.C. § 3626.

The injunctive relief provisions of the PLRA have significant implications for the relief requested in Plaintiffs' Motion. First, any TRO or other inchoate injunctive relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2); *see also **Biodiversity Assocs. v. Cables***, 357 F.3d 1152, 1167 (10th Cir. 2004) (PLRA "had set new limits on the power of courts to give injunctive relief to prisoners, requiring (among other things) that any injunctive relief granted be both narrowly drawn to correct the violation of federal rights and also the least intrusive means of correcting the violation. 18 U.S.C. § 3626(a)(1)(A)."); ***Martinez v. Maketa***, 2011 U.S. Dist. LEXIS 60711, at *10 (D. Colo. June 7, 2011) (""Prior to granting injunctive relief in a prison conditions case, the Prison Litigation Reform Act requires this Court to find that the relief is narrowly drawn, extends no further than necessary to correct the violation of Plaintiffs' constitutional rights, and is the least intrusive means necessary to correct the violation of Plaintiffs' constitutional rights.").

Second, in crafting such relief, this Court "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief." 18 U.S.C. § 3626(a)(2). "Under the PLRA, federal courts

are prohibited from becoming involved in the actions of the state's correctional system absent compelling reasons. A court considering whether to grant injunctive relief in a prisoner case must give substantial weight to any adverse impact on public safety or the operation of the criminal justice system." *Oken v. Sizer*, 321 F. Supp. 2d 658, 666-67 (D. Md.), *cert. denied*, 542 U.S. 917 (2004).

Third, no court can issue a prison release order until it "has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order" and the jail "has had a reasonable amount of time to comply with the previous court orders." 18 U.S.C. § 3626(a)(3)(a)(i) & (ii); *see, e.g.*, *Roberts v. Cnty. of Mahoning*, 495 F. Supp. 2d 694, 698 (N.D. Ohio 2006) (recognizing requirement under the PLRA "that the Defendants have been given an opportunity to correct the problem of jail overcrowding and have been unable to do so without further intervention by this Court.").

Fourth, any prison release order requires a court order from a three-judge panel. 18 U.S.C. § 3626(a)(3)(B)-(E); *Brown v. Plata*, 563 U.S. 493, 514 (2011); *United States v. Cook Cnty.*, 761 F. Supp. 2d 794, 797 (N.D. Ill. 2011). The procedures for appointing a three-judge court are found at 28 U.S.C. § 2284.

Fifth, "the PLRA requires that district courts issuing prospective relief in cases involving prison conditions make certain findings in order for that relief to conform to the law." *Alloway v. Hodge*, 72 F. App'x 812, 815 (10th Cir. 2003). Any failure by a District Court to make these required factual findings under the PLRA is reversible error. *Doe v. Cook Cnty.*, 798 F.3d 558, 564 (7th Cir. 2015).

Any consideration by this Court of Plaintiffs' requested relief must comply with all these provisions of the PLRA. Like the mandatory injunctive relief requested by Plaintiffs here, the PLRA's requirements for injunctive relief also pose a substantial barrier to this Court ordering any such relief.

**B. Deference Is Due to the Expertise and Judgment of Correctional Officials**

Plaintiffs' request for injunctive relief must also be evaluated in the context of the ability and expertise of the Sheriff to appropriately and effectively operate the Weld County Jail, and the concomitant necessitation for the Court to defer to such expertise.

The Supreme Court of the United States has long recognized the need for federal courts to exercise deference to, and restraint in connection with, operations decisions by correctional officials. "[P]roblems that arise in the day-to-day operation of a corrections facility are not susceptible to easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *Romo v. Champion*, 446 F.3d 1013, 1015 (10th Cir. 1995).

The Supreme Court's deference to prison officials arises in part from the expertise those officials possess. *Bell*, 441 U.S. at 548; *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128 (1977). "[W]e accord prison authorities deference as they undertake that complex job." *Williams v. Taylor*, 561 F. App'x 695, 699 (10th Cir. 2014). "We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a

corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

The Supreme Court recognizes deference is also appropriate on separation of powers grounds. "[T]he operation of our correctional facilities is peculiarly the province of the Legislative and Judicial Branches of our Government, not the Judicial." *Bell*, 441 U.S. at 548. "[I]t is not the role of the federal judiciary to scrutinize and interfere with the daily operations of a state prison." *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998). Courts have no power "to supervise prison administration or to interfere with the ordinary prison rules or regulations." *Banning v. Looney*, 213 F.2d 771, 771 (10th Cir. 1954).

"Application of this deferential standard ensures that 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *United States v. Rivera*, 83 F. Supp. 3d 1130, 1133 (D. Colo. 2015) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). "[T]here is a strong public interest in affording substantial deference to prison officials in managing the daily operations of a prison due to the unique nature, needs and concerns of the prison environment." *Pinson v. Pacheco,* 424 F. App'x 749, 756 (10th Cir. 2011). "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have, as we indicated in *Martinez*,

additional reason to accord deference to the appropriate prison authorities.'" *Turner*, 482 U.S. at 85 (citing *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)).

This Court's evaluation of the Sheriff's and the WCJ's response to the COVID-19 pandemic must be undertaken in light of the strong deference this Court must show to jail administrators and officials under these precedents. *See, e.g.*, *Orwig v. Williams*, 2019 U.S. Dist. LEXIS 169556 (D. Colo. Sept. 30, 2019) (Brimmer, C.J.) (evaluating RLUIPA claim under *Turner* in the prison context and recognizing deference due prison officials); *Silverstein v. Fed. Bur. of Prisons*, 704 F. Supp. 2d 1077, 1095 (D. Colo. 2010) (Brimmer, C.J.) ("On issue of prison management and placement of inmates, courts owe prison officials considerable deference.").

## C. Plaintiffs' Misinterpretation of the Law on Conditions of Confinement Claims

A corrective is necessary about Plaintiffs' misinterpretation of the law in the Tenth Circuit concerning conditions of confinement claims.

Plaintiffs' Complaint [ECF 7] attempts two claims under 42 U.S.C. § 1983, both alleging unconstitutional conditions of confinement. The two claims are nearly identical, but Claim 1 is brought under the Fourteenth Amendment for Plaintiffs held as pretrial detainees, and Claim 2 is brought under the Eighth Amendment for Plaintiffs who have been convicted of crimes and are serving sentences. The same standard applies to both these claims. *See Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998); *Ledbetter v. City of Topeka, Kan.*, 318 F.3d 1183, 1188 (10th Cir. 2003).

Plaintiffs argue different standards apply to pretrial detainees and convicted prisoners and argue *Craig* was abrogated by *Kingsley v. Hendrickson*, 135 S. Ct. 2466

(2015). *See* [ECF 1, at 32 n.62]. To support this argument, Plaintiffs cite ***Abila v. Funk***, 220 F. Supp. 3d 1121, 1181 (D.N.M. 2016) (Browning, J.), and cases from various other Circuits, but not the Tenth Circuit. When Judge Browning decided ***Abila***, he did not have the benefit of Tenth Circuit opinions on point. The Tenth Circuit has since observed this argument exists but (repeatedly) declined to address it, as recently as March 26, 2020. *See, e.g.*, ***Khan v. Barela***, 2020 U.S. App. LEXIS 9438 (10th Cir. Mar. 26, 2020) ("In this circuit, there is an open question whether, in light of ***Kingsley***'s pronouncement regarding excessive-force claims, the subjective component of the ***Farmer*** test applies to a pretrial detainee's claims regarding conditions of confinement and inadequate medical care."); ***Burke v. Regalado***, 935 F.3d 960, 991 n.9 (10th Cir. 2019) (recognizing argument but declining to resolve it); ***Perry v. Durborow***, 892 F.3d 1116, 1122 n.1 (10th Cir. 2018).[4] Because the Tenth Circuit has not overruled ***Craig***, it remains controlling law for this Court, Plaintiffs are incorrect, and the same deliberate indifference standard applies to claims for both pretrial detainees and convicted inmates.

The applicable standard, therefore, requires all Plaintiffs to satisfy both an objective and a subjective component. ***Craig***, 164 F.3d at 495. First, the objective component requires the alleged deprivation be "sufficiently serious." ***Wilson v. Seiter***, 501 U.S. 294, 298 (1991). "[O]nly those deprivations denying the minimal civilized measure of life's necessities ... are sufficiently grave to form the basis of an Eighth

---

[4]  *See also* ***Ueding v. Border***, 2019 U.S. Dist. LEXIS 36835 (D. Colo. Mar. 7, 2019) (in case involving pretrial detainee under the Fourteenth Amendment applying ***Kingsley*** to excessive force claim and ***Craig*** to conditions of confinement claim); ***Hill v. Reardon***, 2018 U.S. Dist. LEXIS 234762 (D. Colo. Nov. 16, 2018) (same).

Amendment violation." *Id.* at 298. Both the severity and the duration of the allegedly unconstitutional conditions of confinement are taken into consideration as are the totality of the overall conditions of confinement. *Id.* at 304-05; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).

Second, the subjective component of the inquiry requires the official to have a sufficiently culpable state of mind. "In the context of prison-conditions claims, the required state of mind is one of deliberate indifference to inmate health and safety." *Craig*, 164 F.3d at 495. "In other words, the jailer is liable only if he or she knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* "The test requires both knowledge and disregard of possible risks, a *mens rea* on a par with criminal recklessness. If an official is aware of the potential for harm but takes reasonable efforts to avoid or alleviate that harm, he bears no liability under this standard." *Despain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001) (internal citations omitted).

**D.  Both the Sheriff and This Court Lack Authority to Modify Sentences and Bonds**

An explanation is necessary concerning the legal restraints on the Sheriff's authority to modify sentences and bonds, and this Court's inability to accept Plaintiffs' invitation to weaponize the United States Constitution and require the Sheriff to do so.

Plaintiffs ask this Court to order the Sheriff to ensure social distancing the equivalent of CDC guidelines, or alternatively order the release from the WCJ of sufficient inmates to electronic home monitoring to allow for physical distancing of the equivalent

of CDC guidelines within the WCJ. [ECF 1, at 6-7]. This Court cannot order either of these remedies through a temporary restraining order or through other injunctive relief.

First, due to the physical and architectural realities of the WCJ, the only means to guarantee social distancing by at least six feet at all times would be to authorize the Sheriff and his deputies to use all necessary force to ensure all inmates are socially distancing at all times or to order prisoners released. Neither is a viable option for a temporary restraining order or other injunctive relief.[5]

Second, this Court cannot order Plaintiffs or any other inmates released from the WCJ. First, as discussed above, the PLRA imposes multiple requirements before the federal judiciary may issue a prisoner release order. It is not possible for this Court to comply with those requirements in issuing the requested TRO or any related initial-stage injunctive relief because, among other reasons, the Court must first convene a three judge panel, 18 U.S.C. § 3626(a)(3)(B)-(E), must first enter a less intrusive order, and must first give the Sheriff and WCJ a reasonable time to comply. *Id.*, § 3626(a)(3)(a)(i) and (ii). This cannot be achieved in the expedited timeframe which Plaintiffs contemplate for a TRO or related initial-stage injunctive relief. Any prisoner release order therefore would be reversible error in direct violation of the PLRA.

Third, the Court also cannot use injunctive relief in this action to direct Colorado state judges to take any action. *See* 42 U.S.C. § 1983 (expressly disallowing injunctive

---

[5] For instance, would Plaintiffs have all WCSO deputies refrain from all hands-on methods to subdue noncompliant or disruptive inmates or detainees and use only Tasers or pepperball rounds? The Sheriff certainly would not endorse such a course of action and, presumably, neither would this Court.

relief against a judicial officer "for an act or omission taken in such officer's judicial capacity ... unless a declaratory decree was violated or declaratory relief was unavailable."); **Knox v. Bland**, 632 F.3d 1290, 1292 (10th Cir. 2011). By fiat of Congress, therefore, in a § 1983 action this Court lacks authority to direct a state court judge to modify an inmate's or a detainee's bond, reconsider a sentence, or otherwise direct a state court judge to order the release of a particular inmate.

Fourth, Plaintiffs have not brought this action seeking relief through habeas corpus pursuant to 28 U.S.C. § 2254, which might allow this Court to consider whether individual Plaintiffs' bonds or sentences were unconstitutional.[6]

And even if this Court had the jurisdiction and authority to modify Plaintiffs' bonds through this 42 U.S.C. § 1983 action, **Younger** abstention dictates the Court not intervene into an ongoing criminal prosecution. See **Younger v. Harris**, 401 U.S. 37 (1971); **Chapman v. Oklahoma**, 472 F.3d 747, 749 (10th Cir. 2006) (discussing factors to consider regarding **Younger** abstention). This is especially true where crime victim rights would be implicated and potentially violated. See Colo. Const. Art. II, § 16a ("Any person who is a victim of a criminal act, or such person's designee, legal guardian, or surviving immediate family members if such person is deceased, shall have the right to be heard when relevant, informed, and present at all critical stages of the criminal justice process. All terminology, including the term 'critical stages', shall be defined by the general assembly."); C.R.S. §§ 24-4.1-302(1)(f) & (h) (victim rights attach to charges of assault in

---

[6] Even if Plaintiffs had petitioned for writs of habeas corpus, Plaintiffs likely could not meet the requirements of 28 U.S.C. § 2254(b)(1).

the first and third degree, charges currently pending against Plaintiff Barnum and Carranza, respectively). The victims in these cases have both a constitutional and a statutory right to be informed of all "critical stages,"[7] *id.* § 302.5(1)(b), and also have the right to be informed when the defendant is released from the county jail, *id.* § 302.5(1)(d), and the right to be heard at a bond hearing, *id.* § 302.5(1)(d)(I), a sentencing or resentencing hearing, *id.* § 302.5(1)(d)(IV), or a sentence modification hearing. *Id.* § 302.5(1)(d)(V). Colorado law requires Colorado state judges to inquire whether the victim is present and wishes to address the court at any of these hearings before the Court rules. *Id.* § 303. While these state statutes are not binding on this Court, *Younger* abstention dictates this Court should be mindful of these and other comity and federalism concerns before directly intervening in state criminal cases.

The Sheriff also lacks unilateral authority to release inmates from the WCJ either under his own authority or pursuant to any order from this Court. While the Sheriff is the custodian of the WCJ, C.R.S. § 30-10-511, all WCJ inmates are there because of lawful state court orders. *See, e.g.*, C.R.S. §§ 18-1.3-202 (Colorado state court may sentence a convicted felon, such as Plaintiff Hunter, to up to ninety days jail as a condition of probation); 16-4-102 (Colorado state court must set bond before trial, which a state judge did for Plaintiffs Carranza, Martinez, Barnum, Lewis, and Ward). Convicted inmates may request sentence reconsideration, *see* Colo. R. Crim. P. 35(b), and pretrial detainees may

---

[7] As relevant here, "critical stages" include: change in bond, sentencing or resentencing, modification to a sentence by Colo. R. Crim. P. 35(a) or 35(b) motion, or "the parole, release, or discharge from imprisonment of a person convicted of a crime." *See* Colo. Rev. Stat. §§ 24-4.1-302(2)(c), (h), (j), and (n).

request bond reduction. *See* C.R.S. § 16-4-109.[8] Absent state court orders granting this relief, the Sheriff must abide by current court orders and keep inmates in custody at the WCJ. *See* C.R.S. § 17-26-103 ("keepers of the several county jails ... shall receive and safely keep every person duly committed ... to such jail" and "shall not without lawful authority let out of such jail, on bail or otherwise, any such person"). And the Sheriff cannot release convicted persons before they lawfully serve their sentences. *See* C.R.S. § 17-26-109 (time computation sheriffs are required to apply in calculating release dates and awarding good time to convicts serving sentences in county jails).

In light of these limitations, the Sheriff took proactive steps that are within his legal authority to reduce the WCJ population. The Sheriff directed his deputies, and made several requests of local law enforcement, not to arrest suspects whenever possible but instead to issue summonses for court dates well into the future. This alone has significantly reduced the number of incoming inmates, resulting in a 35% decrease in jail population since March 1, 2020. But Colorado law still requires law enforcement officers to arrest a suspect when the officers have probable cause for specified crimes. *See, e.g.*, C.R.S. 18-6-803.6(1) (peace officer must arrest after determining there is probable cause for offense involving domestic violence). The Sheriff must, therefore, continue to operate

_____

[8] Plaintiffs Carranza, Barnum, and Lewis have petitioned for bond modifications to allow reduced security amounts or personal recognizance bonds, pursuant to C.R.S. § 16-4-109. Colorado state judges considered and denied Mr. Carranza's request on March 18, 2020, Mr. Barnum's request on March 25, 2020, and Mr. Ward's request on March 24, 2020. A Colorado state judge reduced the amount of security required on Mr. Lewis's bond. Plaintiff Hunter has petitioned a Colorado state judge for sentence reduction, but no ruling issued, to the Sheriff's knowledge. Plaintiffs Ward and Propes are no longer in WCJ custody due to the natural expiration of their confinement under statute and caselaw and, as discussed herein, their claims are moot.

within physical structure of the jail and legal structure of Colorado law, receiving new arrivals—after arrest or sentencing—and detaining them until lawfully allowed to release them pursuant to the requirements of Colorado law and any applicable order of a state court judge. This Court's evaluation of Plaintiffs' demand for injunctive relief must be evaluated within these legal constraints on the Sheriff under Colorado law.

### E. Plaintiffs Must Establish a Custom, Policy, or Practice of the Sheriff Violated their Constitutional Rights for Any Cognizable Claim to Be Successful

Plaintiffs sued the Sheriff in his official capacity, not individually. "A 'suit against [the Sheriff] in his official capacity as sheriff is the equivalent of a suit against [the] County.'" *Layton v. Bd. of Cnty. Comm'rs*, 512 F. App'x 861, 867 n.4 (10th Cir. 2013) (alteration in original) (quoting *Lopez v. LeMaster*, 172 F.3d 756, 762 (10th Cir. 1999)). To establish liability for Weld County, Plaintiffs must show "deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Bd. of Cnty. Com'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403 (1997) ("*Bryan Cnty.*"); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). However, Plaintiffs neither pled such a claim in their operative Complaint, ECF 7, nor made any argument in ECF 1 as to why they are likely to succeed on the merits of such a claim. Veritably, it is because they cannot.[9]

A local government may not be sued under 42 U.S.C. § 1983 for an injury inflicted solely by its employees or agents. *Waller v. City & Cnty. of Denver*, 932 F.3d 1277 (10th

---

[9] What's more, even if Plaintiffs were somehow to amend their Complaint in the future to add a *Monell* municipal liability claim or restructure their allegations to attempt to allege a municipal liability claim, they won't be entitled to the presumption of fact as to any allegation which contradicts the evidence encompassed by the Sheriff's Declaration.

Cir. 2019) (affirming Rule 12 dismissal); *Mocek v. City of Alb.*, 813 F.3d 912, 934 (10th Cir. 2015). Municipal liability under § 1983 mandates a constitutional violation "attributable to the municipality itself" and requires a plaintiff to demonstrate (1) the existence of a municipal custom or policy and (2) a direct and causal link between the custom or policy and the violation alleged. *Jenkins v. Wood*, 81 F.3d 988, 993 (10th Cir. 1996). Indeed, to adequately allege municipal liability, a plaintiff must state sufficient nonconclusory facts on: "(1) official policy or custom, (2) causation, and (3) state of mind." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013).

> *Custom/Policy/Practice:* an "official policy or custom" must take one of five forms:
>
> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Waller*, 932 F.3d at 1283; *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010). Regardless of the plaintiffs' specific municipal liability theory, the plaintiffs bear the burden to demonstrate the essential policy or custom. *See Bryan Cnty.*, 520 U.S. at 403 ("In *Monell* and subsequent cases, we have required a *plaintiff* seeking to impose liability on a municipality . . . to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury.") (emphasis added)). The factual basis for an alleged policy or custom must consist of much more than what allegedly happened to the plaintiffs. *E.g.*, *Griego v. City of Alb.*,

100 F. Supp. 3d 1192, 1215 (D.N.M. 2015) ("[A]t the pleading stage, the existence of a *Monell* policy is a 'conclusion' to be built up to, rather than a 'fact' to be baldly asserted.").

A custom is a "persistent and widespread" practice which "constitutes the standard operating procedure of the local governmental entity." *Mitchell v. City & Cnty. of Denver*, 112 F. App'x 662, 672 (10th Cir. 2004). It may also be a series of decisions by a subordinate official of which the supervisor must have been aware. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988). Liability attaches in such a case because "the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official." *Id.*

"Consistent with the plain meaning of 'custom,' proof of an isolated incident does not show a custom." *King v. Glanz*, 2014 U.S. Dist. LEXIS 84927, at *4-5 (N.D. Okla. June 23, 2014); *see Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996); *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993). Evidence of how a municipality's actors acted in just one case is insufficient to establish a persistent and widespread practice that is permanent and well settled (the high threshold necessary to succeed on a municipal liability claim). *Henderson v. City & Cnty. of Denver*, 2014 U.S. Dist. LEXIS 7140, *30 (D. Colo. Jan. 21, 2014); *City of Okla. City v. Tuttle*, 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by existing, unconstitutional municipal policy.").

*Causation:* the entity, via "deliberate" conduct, must have been the "moving force" behind the alleged injury, requiring both an action "taken with the requisite degree of

culpability" and a "direct causal link" between the action and the alleged deprivation of rights. ***Bd. of Cnty. Comm'rs v. Brown***, 520 U.S. 397, 404 (1997); *see **Bryan Cnty.**,* 520 U.S. at 404; ***Canton***, 489 U.S. at 385. And even if a constitutional violation occurred as purportedly alleged, no municipal liability is based on pure *respondeat superior*. *See **Monell***, 436 U.S. at 694. Local governments are liable <u>only</u> for their own illegal acts. ***Connick v. Thompson***, 563 U.S. 51, 60 (2011). This causation requirement is satisfied if the plaintiffs show "the municipality was the 'moving force' behind the injury alleged." ***Bryan Cty.***, 520 U.S. at 404. As the Supreme Court has made increasingly clear over the past 40 years, proof of a policy claim requires a tight causal connection between the alleged policy and the constitutional injury. In ***Monell***, the Court held a plaintiff had to identify a causal nexus between his injury and the municipality's alleged custom or policy. ***Monell,*** 436 U.S. at 693-94. And in ***City of Canton***, the Court held a viable municipal liability claim required the identified deficiency in a city's training program must be "closely related to the ultimate injury." ***Canton,*** 489 U.S. at 391.

<u>State of Mind:</u> In addition, Plaintiffs must also establish the requisite degree of culpability on the County's part – namely, the alleged municipal practices were carried out with "deliberate indifference" to their known or obvious consequences. ***City of Canton v. Harris***, 489 U.S. 378, 388 (1989); ***Bryan Cnty.***, 520 U.S. at 400. The prevailing state-of-mind standard for entity liability in the Tenth Circuit is deliberate indifference "regardless of the nature of the underlying constitutional violation." ***Schneider***, 717 F.3d at 771 n.5. Importantly, for a conditions of confinement case like the above-captioned action, deliberate indifference "is defined differently for Eighth Amendment and municipal

liability purposes." ***Barney v. Pulsipher***, 143 F.3d 1299, 1307 n.5 (10th Cir. 1998). The

deliberate indifference standard for prison conditions is a subjective standard, requiring

"actual knowledge of a risk by the official." ***Id.*** Deliberate indifference for municipal liability,

in stark contrast, is an objective standard and requires a risk to be "so obvious that the

official [or the entity] should have known of it." ***Id.*** That is, to even get to the merits of an

Eighth Amendment claim, Plaintiffs must hurdle an extremely high threshold bar.

## F.  Alleged Violation of the Centers for Disease Control Social Distancing or Other Guidelines Is Not the Equivalent of a Violation of the United States Constitution

The entire thrust of Plaintiffs' Motion is an effort to establish the Sheriff and the

WCJ allegedly failed to adhere to the social distancing and other guidelines set by the

CDC. [*See generally* ECF 1]. This Court must reject Plaintiffs' effort to constitutionalize

the CDC guidelines. The issue before this Court is not whether the Sheriff and the WCJ

are adhering to the CDC guidelines—although as the Sheriff's Declaration establishes,

they are, to the best of their abilities based on the realities of the daily operations of a

jail—but rather, whether the customs, policies and procedures of the WCJ implemented

by the Sheriff to address COVID-19 violate the United States Constitution.

It has long been the law that a violation of agency policy, regulation, rule, training,

or practice—from any agency—is not the equivalent of a violation of constitutional rights.

*See, e.g., **Davis v. Scherer***, 468 U.S. 183, 193-96 (1984); ***Tanberg v. Sholtis***, 401 F.3d

1151, 1159-60 (10th Cir. 2005); ***Herring v. Keenan***, 218 F.3d 1171, 1180 (10th Cir.

2000); ***Wilson v. Meeks***, 52 F.3d 1547, 1554 (10th Cir. 1995); ***Giannetti v. City of***

***Stillwater***, 216 F. App'x 756, 766 (10th Cir. 2007). No reasoned difference exists to

distinguish the CDC's COVID-19 social distancing and other guidelines from the above

precedent. This Court must focus not on whether the current operations of the WCJ are compliant with the CDC or other health and safety guidelines, but whether they violate the inmates' constitutional rights—two altogether different inquiries.

**G. Plaintiffs Have Not Met and Cannot Meet the Legal Requirements Necessary for their Requested Injunctive Relief in the Form of a TRO Here as a Matter of Law.**

Keeping all the above principles in mind, as the Court must, Plaintiffs have not satisfied and cannot satisfy any of the four elements necessary to grant injunctive relief. Thus, this Court should deny Plaintiffs' Motion and deny the sought-after injunctive relief in the form of a TRO and of an expedited hearing.

*1.  Plaintiffs have no likelihood of success on the merits whatsoever.*[10]

Plaintiffs' two claims against the Sheriff are brought in his official capacity. These claims are therefore asserted against Weld County. *See **Layton***, 512 F. App'x at 867 n.4. While ECF 1 discusses the merits of Plaintiffs' claimed constitutional deprivation, ECF 1 omits any discussion or argument as to municipal liability. This is fatal, as Plaintiffs did not even attempt to show they are likely to succeed on a municipal liability claim.

The Court need not even consider this flaw, however, because Plaintiffs cannot prove an underlying deprivation of constitutional rights. *See **Ellis v. Ogden City***, 589 F.3d 1099, 1104 (10th Cir. 2009) (municipal "liability will not attach 'where there was no underlying constitutional violation by any of [the municipality's] officers.'") (quoting ***Graves***

---

[10] Plaintiff Ward and Plaintiff Propes have been released from the WCJ due to the natural expiration of their confinement under statute and caselaw. Longstanding Tenth Circuit precedent which this Court must follow dictates their claims for injunctive relief (the only type of relief sought in ECF 1) are moot without possibility of resurrection. *E.g.*, ***Green v. Branson***, 108 F.3d 1296, 1300 (10th Cir. 1997).

*v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (alteration in original)). Applying the Eighth Amendment deliberate indifference standard makes this clear, for two reasons.

First, the Sheriff recognizes the seriousness of the COVID-19 pandemic and the potential of the virus to cause a serious health condition if a person falls ill. To the Sheriff's knowledge, none of the Plaintiffs have been sick with COVID-19 or are sick with COVID-19. For simplicity and efficiency, however, the Sheriff is not contesting the objective factor of the Eighth Amendment deliberate indifference standard purely for purposes of this Response, but the Sheriff reserves the right to do so later in the proceedings.

Second, the Sheriff **was not** deliberately indifferent. The WCSO and its leader have taken the COVID-19 crisis quite seriously and implemented many new processes and procedures to protect jail staff and inmates, as more fully described in the Sheriff's Declaration. [*See* **Exh. A** and its attachments]. Contrary to Plaintiffs' hyperbolic assertions, the Sheriff is and has been aware of the dangers posed by COVID-19, and it is precisely because the Sheriff has been aware of those dangers the WCSO acted quickly and decisively to implement these policies and procedures beginning as far back as February 2020. Because the Sheriff "[took] reasonable efforts to avoid or alleviate that harm, [the Sheriff] bears no liability under this standard." **Despain**, 264 F.3d at 975. **Despain** requires **reasonable** efforts, and the Court must evaluate the actions of the Sheriff and the WCSO in the context of what reasonably can be achieved within a jail. It is undisputed a jail cannot be expected to replicate the conditions of a hospital.[11]

---

[11] Although even hospitals have been forced to adapt to provide care to COVID-19 patients. *See, e.g.,* Madeline Holcombe, Holly Yan and Eric Levenson, **New York's Central Park and harbor are now home to makeshift hospitals**, CNN, March 30, 2020,

The following represents but a fraction of the many new policies and procedures which the Sheriff and the WCSO put in place to protect staff and inmates from COVID-19 in the WCJ, as more fully detailed in **Exh. A** and its attachments which must be considered as a whole (citations are noted parenthetically by page and paragraph):

- The WCSO implemented multiple policies to allow for social distancing, within the physical limits allowed by WCJ population and its physical plant: March 13, 2020 limits on outside visitors (pp. 7-8, ¶¶ 22-23); multiple iterations of social distancing guidelines for WCSO staff (p. 8, ¶ 25; p. 12, ¶ 44; pp. 13-14, ¶ 49); reduced inmate reclassification (p. 19, ¶ 79); and March 31, 2020, transmission of a then-current list of all inmates for sentence review to the Chief Judge for the Nineteenth Judicial District of Colorado (p. 16, ¶ 65).

- The WCJ employs a professional janitorial staff which has been cleaning and sanitizing, and continues to clean and sanitize, the WCJ (p. 25, ¶ 109); all library books are now cleaned and sanitized after each use (p. 15, ¶ 56); common-use fixtures, such as water fountains, are sanitized multiple times per day (p. 22, ¶ 93); and the WCJ both directed inmates to clean and sanitize toilets before and after each use and provided supplies for that purpose (p. 22, ¶ 94).

- The WCJ has provided to inmates free of charge, continues to provide to inmates free of charge, and will continue to provide to inmates free of charge, sanitation supplies like soap and cleaner (p. 21, ¶ 91); and on February 27, 2020, perceiving

available at: https://www.cnn.com/2020/03/30/us/new-york-coronavirus-cases-deaths/index.html (last visited April 11, 2020).

the potential future risk which COVID-19 might pose to the jail, the WCJ began doubling its normal order of Clorox wipes and hand sanitizer (p. 3, ¶ 10).

- The WCJ attempted to procure masks for inmates for weeks, but they proved difficult to obtain (p. 8, ¶ 24; p. 14, ¶ 50); and after nearly a month of trying to obtain masks, the WCJ received a shipment on April 8, 2020, and immediately distributed masks to all inmates, along with guidance on proper use of masks (p. 20, ¶ 83).

- On March 11, 2020, the WCSO instructed Aramark, its food services vendor, to develop a plan in the event of a COVID-19 outbreak at the jail, and the WCSO received that plan from Aramark on March 13, 2020 and verbally requested on March 30, 2020 that Aramark plan to implement it if necessary (p. 6, ¶ 17; p. 7, ¶ 21; p. 16, ¶ 62); on April 6, 2020, the WCJ began requiring inmate trustees, who work in multiple functions in the jail including food preparation, to have their temperature taken before work and to wear masks while working (p. 20, ¶ 81).

- On March 10, 2020, the WCSO requested its medical services vendor to prepare screening tools for COVID-19 for deputies to ask all new arrivals during booking (pp. 4-5, ¶ 14); on March 11-12, 2020, WCSO implemented a screening and isolation protocol for COVID-19 (pp. 5-6, ¶ 15); on March 16, 2020, well before there were any positive COVID-19 tests in the WCJ, the WCSO set aside areas of the WCJ for "screening pods" or multi-day observation of new arrivals (p. 9, ¶ 30); after the WCJ identified its first suspected COVID-19 case in an inmate on March 19, 2020, all other occupants of the inmate's unit were screened (pp. 11-12, ¶ 43); after the first positive COVID-19 test of an inmate on March 31, 2020, the WCJ

implemented multiple policies to quarantine the podmates of that inmate in the same pod (pp. 17-18, ¶ 68); and the WCSO placed the entire WCJ population on lockdown on April 1, 2020, to reduce any spread of COVID-19 (p. 18, ¶ 69).

• Inmates continue to have the same access to media as they have always had (pp. 23-24, ¶ 103); on April 9, 2020, the WCSO posted reminders of COVID-19 related information (p. 20, ¶ 84); and on April 10, 2020, each inmate was given a flyer on CDC-recommendations for how to use masks (p. 21, ¶ 87).

This summary includes only a portion of the steps the Sheriff and the WCSO have taken to protect the health and safety of inmates and staff at the WCJ. The Sheriff's well-documented actions to combat COVID-19 are significantly more credible than Plaintiffs' own Declarations, which allege vague and unsupported concerns. The Sherriff asks the Court to review his entire Declaration and all attachments. After doing so, the Court must conclude the Sheriff was not deliberately indifferent under the Eighth Amendment standard. Plaintiffs have not, cannot, and will not prove any constitutional deprivation.

More fundamentally, regarding the municipal liability standard which as a matter of law undisputedly applies here, Plaintiffs have made no showing the County is liable. ECF 1 does not specifically articulate which of the five established theories of municipal liability on which Plaintiffs rely, *see* Section V.E *supra*; it does not address how the Sheriff was deliberately indifferent under the municipal liability standard; and it does not address how any custom, practice, or policy of the Sheriff was the moving force behind Plaintiffs' asserted constitutional violations. In other words, Plaintiffs blithely ignore municipal liability entirely, though the only claims Plaintiffs brought are municipal liability claims.

The Sheriff does not know which theory Plaintiffs would put forth for municipal liability and will not speculate about the relative merits of any potential theories here. But as the Sheriff's Declaration, its attachments, and the above summary thereof show, the Sheriff and WCSO decisionmakers were not deliberately indifferent, categorically, to obvious risks to inmates. To the contrary, relevant decisionmakers acted early and often to ensure a reasonably safe environment within a jail setting. Given the multiple policies and actions taken to address COVID-19 in the WCJ, no potential municipal liability theory could succeed as the moving force behind a constitutional deprivation for Plaintiffs.

Plaintiffs have not made any showing of why they are likely to succeed on their municipal liability claims, let alone the "strong showing" required for this Court to grant disfavored injunctive relief. Plaintiffs are quite unlikely to prevail on the merits at all, much less marshal the required showing of a "substantial" likelihood of success on the merits.

*2.  For purposes of this Response, the Sheriff does not contest the prospect of irreparable injury which might result from COVID-19 as a general matter.*

The Sheriff acknowledges falling ill with COVID-19 poses real and serious health risks to many people worldwide, including Plaintiffs. To the Sheriff's knowledge, however, none of the Plaintiffs is sick with COVID-19. For simplicity and efficiency, however, the Sheriff is not contesting this factor for the purposes of this Response, but reserves the right to do so later in the proceedings.

*3.  The threatened injury does not outweigh potential harm to WCJ and WCSO.*

Plaintiffs argue there is no identifiable harm to the WCJ or WCSO, except minor administrative costs. [ECF 1, at 50]. This is entirely incorrect for several reasons. First, the WCSO assuredly has a strong and judicially recognized interest in maintaining control

over the WCJ without Court supervision. *E.g.*, **Overton**, 539 U.S. at 132; **Bell**, 441 U.S. at 547-48. Mandatory injunctive relief would necessitate ongoing Court supervision to assure the WCSO is abiding by any order. **SCFC ILC**, 936 F.2d at 1099. The WCSO would thus lose the ability to react quickly to changes in circumstances in the WCJ and would have to go to the Court for approval continuously, as the WCJ adapts to the evolving COVID-19 crisis and public health recommendations. Second, the multiple forms of injunctive relief Plaintiffs request, *see* [ECF 1, at 6-7], would require the WCSO to take many separate actions, the cost and implementation of which are ambiguous. Plaintiffs have not addressed how the Court could, for instance, order a third-party vendor of professional cleaners with no correctional experience to work in a secure facility such as a jail. How quickly would the cleaners have to be hired? Would there be adequate time to vet them for security risks? Would the WCSO be liable if the cleaners were negligent in cleaning and sanitizing? Would Weld County taxpayers be required to pay for the cleaners? And what about the already-employed professional cleaning staff, would they have to be kept on payroll while displaced by this third-party vendor yet have the County continue paying the payroll costs of wages and benefits due County employees?

Plaintiffs also fail to address whether they are asking the Court to order the WCSO to provide each inmate only one mask or a separate mask for each day. As the Court is no doubt aware, there is a nationwide shortage of personal protective equipment ("PPE"), including masks.[12] While the WCSO has worked for weeks to locate PPE—with quite a

---

[12] *See* Olga Khazan, ***Why We're Running out of Masks***, The Atlantic, April 10, 2020, available at https://www.theatlantic.com/health/archive/2020/04/why-were-running-out-of-masks-in-the-coronavirus-crisis/609757/ (last visited April 11, 2020).

few staff members even using homemade masks to conserve WCJ mask supply for inmates, *see* [**Exh. A**, p. 24 ¶ 104], the WCSO faces the same hurdles as the rest of the United States in locating and obtaining PPE supplies. Similarly, Plaintiffs fail to address how the WCJ could implement policies enforcing social distancing at all times yet guard against the additional liability the WCSO presumably and otherwise would be alleged to bear for using varying levels of force in carrying out those Court-ordered policies.

As even these few considerations show, Plaintiffs fail to show their interests outweigh the alarming potential of damage to the WCSO, for the very simple reason it did not occur to Plaintiffs to realistically consider the potential damage to the WCSO. And Plaintiffs certainly have not made the "strong showing" required for the Court to grant this disfavored injunctive relief. The Court must conclude Plaintiffs have not met their burden on this "balance of harms" factor.

### 4. Plaintiffs' requested injunctive relief would be adverse to the public interest because it unreasonably threatens public safety.

The PLRA requires this Court to "give substantial weight to any adverse impact on public safety" in considering injunctive relief that would release prisoners. 18 U.S.C. § 3626(a)(2); *see also* Section V.A *supra*. Plaintiffs disregarded this requirement and do not discuss public safety or acknowledge public safety risks at any point. Given the architectural and staffing realities of the WCJ, it is neither possible nor advisable for the WCSO to patrol the WCJ to ensure all inmates are at least six feet from all other people at all times. Plaintiffs ask, in the alternative, this Court order prisoners released from the WCJ. [ECF 1, at 7]. Beyond the multiple legal impediments to such an order, *see* Sections V.A & V.D *supra*, releasing inmates would create an unjustifiable public safety risk. To be

blunt, there are very good reasons Colorado state judges determined WCJ inmates should be confined there and not remain at liberty in the community. A review of the public safety risks which Plaintiffs themselves pose merely underscores this overriding concern:

- Plaintiff Carranza is currently held in the WCJ on a $1,000 cash or surety bond, facing a charge of assault in the third degree, pursuant to C.R.S. § 18-3-204. Mr. Carranza has failed to appear or failed to comply with court orders six times. His prior criminal history includes arrests for burglary, possession of a controlled substance, forgery, and a sentence to the Colorado Department of Corrections and later arrest for a parole violation, among other arrests. Given his poor record of compliance with court orders and his prior criminal history, he poses a significant community safety risk. This is perhaps why Colorado state judges have already denied two motions for bond modification from Mr. Carranza, filed March 16 and 23, 2020. *See* **Exhibit A-40** for further information on Mr. Carranza.

- Plaintiff Martinez is currently held on three separate bonds: a $70,000 cash or surety bond for a charge of escape, a $50,000 cash or surety bond for a controlled substance charge, and a $10,000 cash or surety bond for a charge of vehicular eluding. Mr. Martinez has failed to appear or failed to comply with court orders 10 times. His prior criminal history includes arrests for vehicular eluding and possession of a controlled substance, a bond violation, and a sentence to the Colorado Department of Corrections and later arrest for a parole violation, among other arrests. Given Mr. Martinez's record of noncompliance with court orders, his current charge of escape, and his prior criminal history, Mr. Martinez presents an

unjustifiable community safety risk. This likely explains why Colorado state judges have required and aggregate $130,000 in cash or surety bonds. *See* **Exhibit A-41** for further information on Mr. Martinez.

- Plaintiff Barnum is currently held in the WCJ on a $25,000 cash or surety bond, facing a charges of assault in the first degree, pursuant to C.R.S. § 18-3-202, alleging he intentionally caused serious bodily injury to another with a deadly weapon, a statutory crime of violence under Colorado law requiring a sentence to the Colorado Department of Corrections of between 10 and 32 years. *See id.* § 18-1.3-406. Mr. Barnum has failed to appear or failed to comply with court orders thirteen times. His prior criminal history includes six prior arrests for driving under the influence and a sentence to the Colorado Department of Corrections for theft, among other arrests. The serious nature of his current charge and its mandatory prison sentence, Mr. Barnum's poor record of compliance with court orders, and the significant public safety risk posed by multiple DUI offenders make him a significant and unjustifiable public safety risk. He sought a bond modification with the Colorado state court and has a bond hearing scheduled for April 15, 2020. *See* **Exhibit A-42** for further information on Mr. Barnum.

- Plaintiff Lewis is currently held in the WCJ on a $500 cash only bond, facing a felony charge of driving under the influence with three or more prior convictions, pursuant to C.R.S. § 42-4-1301, obstructing a peace officer, and possession of a controlled substance, among other charges. He is also held on a $1,000 cash only bond, facing an allegation that he failed to comply with probation. Mr. Lewis has

failed to appear or failed to comply with court orders five times. His prior criminal history includes four prior arrests for driving under the influence, multiple prior controlled substance related arrests, and an arrest for vehicular eluding, among other arrests. Despite Mr. Lewis's poor record of compliance with court orders and the significant public safety risk of multiple DUI offenders, especially those who elude peace officers, a Colorado state court judge reduced Mr. Lewis's original $60,000 cash bond to the current $1,000 cash bond. *See* **Exhibit A-43** for further information on Mr. Lewis.

- Plaintiff Ward has been released from the WCJ. *See Green*, 108 F.3d at 1296.

- Plaintiff Propes has been released from the WCJ. *See Green*, 108 F.3d at 1296.

- Plaintiff Hunter is currently serving a jail sentence for possession of a weapon by a previous offender, a charge necessarily requiring a prior felony conviction. *See* C.R.S. § 18-12-108. His scheduled release date is April 26, 2020. He has a sentence reconsideration hearing scheduled for Tuesday, April 14, 2020. *See* **Exhibit A-46** for further information on Mr. Hunter.

As this information shows, releasing Plaintiffs—at least those who are even still detained—into the Weld County community before a Colorado state court judge has determined they should be released would pose an unjustifiable community safety risk. The community should not be forced to bear the risk of violent offenders, multiple DUI offenders, and offenders who consistently and repeatedly fail to comply with court orders. Plaintiffs' assertion they are at risk of sickness and death in the WCJ does not outweigh the proven threat to community safety of all Plaintiffs who remain housed within the WCJ.

Moreover, this Court should be mindful of comity and federalism, *see* Section V.D *supra*, and should be loath to override public safety decisions made by Colorado state court judges, who have substantially more information available to them about individual inmates in the WCJ than does this Court, as this Court is well aware from its own experience making similar release decisions in the federal system.

Finally, the COVID-19 crisis has impacted law enforcement as it has every other sector of society. The additional strain upon law enforcement's already heavy burden during this crisis of releasing dangerous offenders in the community is not in the public interest. In summary, the public safety risk of Plaintiffs' sought-after relief strongly outweighs Plaintiffs' interest in the relief, meaning Plaintiffs won't prevail on this factor.

### 5.  *If the Court orders injunctive relief, significant security should be required.*

Fed. R. Civ. P. 65(c) allows the Court to order a security as a condition of any injunctive relief "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Sheriff asserts any injunctive relief, in the form of a TRO or otherwise, is manifestly inappropriate. But if the Court does order relief, the WCSO may have significant costs to bear—costs which ultimately would be borne by Weld County taxpayers. Thus, to compensate those taxpayers for potentially improvident relief, the Court should order posting of a security interest of at least $500,000.[13]

---

[13] As stated in the Sheriff's Declaration, the WCJ's year-to-date net operating cost through February 29, 2020 is $77,470 daily, which is the best available figure the Sheriff could give the Court as of April 13, 2020, given data entry limitations. [ECF 1, at 25 ¶ 113]. Multiplying this figure by the 14 days for which a TRO would be active comes out to a total of $1,084,580. Although imposition of a security posting requirement of even less than half of such a figure in this case still may seem harsh, it would be equally harsh to saddle Weld County taxpayers with the costs of improvidently granted injunctive relief.

This security would account for a wide range of potential (or likely) costs of the requested injunctive relief, such as: hiring an outside cleaning company to clean the jail each day; keeping the already-existing County janitorial staff on payroll and benefits while this third-party vendor does their job; moving more deputies into the jail to enforce inmate social distancing, thereby reducing law enforcement presence in the community; paying the exorbitant cost for already-existent PPE on primary or secondary markets, if the PPE is to be replaced daily; locating and paying for alternate locations to house inmates (if they even exist at this point), such as other jails, if the court orders a reduction in inmate numbers in the WCJ, as the WCSO cannot lawfully release inmates from custody; defending potential lawsuits based on excessive force, prison conditions, or other claims, and on sanctions for violating victim rights, caused by compliance with the Court's Order.

Moreover, as discussed above, several Plaintiffs have cash or surety bonds which Colorado state judicial officers have been unwilling to remove, and the Colorado Supreme Court recently denied a strikingly similar request to order the mass and immediate release of persons in county jails due to the pandemic.[14] Granting injunctive relief without security would be an end run around those bonds, as it could require Plaintiffs' release without payment of security, contravening the considered judgment of Colorado state court judges. For all these reasons, if the Court grants injunctive relief despite the many weighty arguments, authorities, exhibits, and explanation the Sheriff has provided the Court here, the Court should require Plaintiffs to post a security interest of at least $500,000.

---

[14] *See* dockets in Colo. Sup. Ct. Nos. 2020SA116 (and Apr. 3, 2020 Order), 2020SA117 (and Apr. 3, 2020 Order), of which the Court can take judicial notice.

### 6.   Other legal considerations weigh against granting injunctive relief.

First, a temporary restraining order is appropriate only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). Plaintiffs offered the Court neither affidavits signed by all Plaintiffs directly nor a verified complaint signed by all Plaintiffs directly. And besides, the Court must assess their claimed entitlement to a TRO and emergency hearing in light of the state of the facts as of today April 13, 2020, not as of April 7, 2020.

Second, Plaintiffs' sought-after injunctive relief would place the Sheriff between a proverbial Scylla and Charybdis. The Sheriff would be forced to choose between complying with the narrowness of Colorado state law on detaining inmates pursuant to Colorado state court orders, *see* Section V.D *supra*, and complying with the breadth of this Court's orders potentially requiring the release of those inmates. Where an entity defendant like the Sheriff would be "whipsaw[ed]" into attempting to comply with two conflicting directives issued by two different courts, as here, temporary injunctive relief is especially inappropriate. ***Bayaud Enters. v. United States Dep't of Veteran's Affairs***, 2019 U.S. Dist. LEXIS 97303, at *15-16 (D. Colo. June 10, 2019) (Krieger, S.J.).

Third, the PLRA's multiple requirements for injunctive relief as to prisoners such as Plaintiffs and the rest of their WCJ co-inmates, *see* Section V.A *supra*, significantly weigh against granting Plaintiffs a TRO or other injunctive relief. Granting the relief in contravention of the PLRA's plain requirements likely would be reversible error, and the Court should decline Plaintiffs' invitation to meander into the buzzsaw of reversible error.

## VI.  **CONCLUSION**

Plaintiffs would have this Court, and the public, believe the Sheriff is plucking his Stradivarius gleefully while the Weld County Jail and its inmates succumb to COVID-19.[15] However, as the above authorities, analysis, exhibits, and explanation demonstrate forcefully, such a characterization is far from the actual truth. Rather, the evidence presented in and along with this Response demonstrates the Sheriff and the Weld County Sheriff's Office have diligently, comprehensively, and appropriately addressed COVID-19 at the Weld County Jail. Every day, Weld County Jail personnel balance the needs of safety and security with the health needs of all the inmates in the Jail and themselves.

In conclusion, for the foregoing reasons, Defendant Sheriff Steven Reams, as the duly elected Sheriff for the County of Weld, State of Colorado, respectfully requests this Court enter an Order: denying Plaintiffs' application for a temporary restraining order and expedited hearing in this matter; and granting all other relief deemed just and proper.

Respectfully submitted this 13th day of April, 2020.

*s/ Matthew J. Hegarty*
Matthew J. Hegarty, Esq.
Andrew D. Ringel, Esq.
John F. Peters, Esq.
of HALL & EVANS, LLC
1001 17th Street, Suite 300
Denver, CO 80202
T:  (303) 628-3300
F:  (303) 628-3368
hegartym@hallevans.com
ringela@hallevans.com
petersj@hallevans.com
**ATTORNEYS FOR DEFENDANT**

---

[15] *See* Mary Beard, ***SPQR, A History of Ancient Rome*** 398 (1st paperback ed. 2016) (relaying historical account of the Emperor Nero fiddling whilst Rome burned).

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on this 13th day of April, 2020, on or before 9:00 AM MDT, a true and correct copy of the foregoing **DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED HEARING [ECF 1]** was electronically filed with the Clerk of Court which will send notification of such filing to the following email addresses:

Darold W. Killmer
David A. Lane
Andrew Joseph McNulty
Michael Paul Fairhurst
KILLMER LANE & NEWMAN LLP
dkillmer@kln-law.com
dlane@kln-law.com
amcnulty@kln-law.com
mfairhurst@kln-law.com
***Attorneys for Plaintiffs Thomas Carranza, Jesus Martinez, Michael Ward, Colby Propes, and Chad Hunter***

David George Maxted
MAXTED LAW LLC
dave@maxtedlaw.com

Jamie Hughes Hubbard
STIMSON STANCIL LABRANCHE
HUBBARD LLC
hubbard@sslhlaw.com
***Attorneys for Plaintiffs Thomas Carranza, Jesus Martinez, Michael Ward, Colby Propes, and Chad Hunter***

Daniel David Williams
Lauren Elizabeth Groth
HUTCHINSON BLACK & COOK, LLC
williams@hbcboulder.com
groth@hbcboulder.com
***Attorneys for Plaintiffs Richard Barnum and Thomas Lewis***

Mark Silverstein
Rebecca Teitelbaum Wallace
Sara R. Neel
AMERICAN CIVIL LIBERTIES UNION-DENVER
msilverstein@aclu-co.org
rtwallace@aclu-co.org
sneel@aclu-co.org
***Attorneys for Plaintiffs Richard Barnum and Thomas Lewis***

*s/ Marlene Wilson,* Legal Assistant at
HALL & EVANS, L.L.C.