IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Case No. 20-cv-00977-PAB

THOMAS CARRANZA,
JESUS MARTINEZ,
RICHARD BARNUM,
THOMAS LEWIS,
MICHAEL WARD,
COLBY PROPES, and
CHAD HUNTER,

Plaintiffs, on their own and on behalf of a class of similarly situated persons,

v.

STEVEN REAMS, Sheriff of Weld County, Colorado, in his official capacity,

Defendant.

_____

# ORDER
_____

This matter is before the Court on that portion of plaintiffs' Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing [Docket No. 1] seeking a preliminary injunction. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I.   BACKGROUND

### A.   Procedural History

On April 7, 2020, plaintiffs initiated this lawsuit. Docket No. 1. Plaintiffs are seven individuals who, at the time the lawsuit was filed, were held in the Weld County Jail in Weld County, Colorado, either as a pretrial detainee (Thomas Carranza, Michael Ward, Jesus Martinez, Richard Barnum, and Thomas Lewis), post-conviction and

awaiting sentencing (Colby Propes), or serving a carceral sentence (Chad Hunter).

*See* Docket No. 7 at 7-10, ¶¶ 17-24.  Plaintiffs bring two claims for unconstitutional

conditions of confinement pursuant to 42 U.S.C. § 1983, one under the Eighth

Amendment and one under the Fourteenth Amendment, against Steven Reams in his

official capacity as the Weld County Sheriff.  *See id*. at 25-27, ¶¶ 68-74.  Both claims

are brought as a class action pursuant to Fed. R. Civ. P. 23, defined as the following

class of individuals:

> All current and future persons held at the Weld County Jail who are at
> high risk of complications from COVID-19 because:
>
> (a) they are age 55 or older; or
>
> (b) they have the following chronic health conditions: cancer; autoimmune
> disease (including lupus, rheumatoid arthritis, psoriasis, Sjogren's,
> Crohn's); chronic lung disease (including asthma, chronic obstructive
> pulmonary disease, bronchiectasis, idiopathic pulmonary fibrosis or other
> chronic conditions associated with impaired lung function); history of
> cardiovascular disease; chronic arthritis; chronic liver or kidney disease;
> diabetes; hypertension; heart failure; HIV; on chronic steroids or other
> immunosuppressant medications for chronic conditions;
>
> (c) they have history of smoking or other substance abuse disorders; or
>
> (d) they are pregnant.

Docket No. 7 at 24-25, ¶ 65.  Plaintiffs also filed a motion for class certification.  Docket

No. 2.

On April 7, 2020, plaintiffs filed a motion for a temporary restraining order,

preliminary injunction, and expedited hearing.  Docket No. 1.  Plaintiffs ask that the

Court order defendant to "implement a plan that will . . . ensure that [p]laintiffs are

protected from the threat of COVID-19 exposure by compliance with public health

guidelines." *Id.* at 5-7.[1]  Defendant filed a response on April 13, 2020.  Docket No. 26.

The next day, plaintiffs withdrew the portion of their motion seeking a temporary

restraining order and asked to proceed to a hearing on the portion of their motion

seeking a preliminary motion.  Docket No. 29.  Defendant filed a supplemental reply on

April 24, 2020, Docket No. 41, and plaintiffs filed a reply on April 28, 2020.  Docket No.

49.  The Court also permitted limited expedited discovery.  Docket No. 36.

On April 30, 2020, the Court conducted a hearing on plaintiffs' preliminary

injunction motion.  Docket No. 52.  The hearing was conducted remotely using video

teleconference, with two witnesses without access to video teleconference links

testifying by telephone.  *See* Docket No. 39 at 2 (finding that, pursuant to Fed. R. Civ.

P. 43(a), good cause and compelling circumstances existed for remote testimony).  The

Court heard testimony from Kevin Monteiro, plaintiff Richard Barnum, Dr. Carlos

Franco-Paredes, and defendant Steven Reams.[2]

---

[1] Plaintiffs' motion included an alternative request that the Court "order the transfer of a sufficient number of inmates to electronic home monitoring to allow for appropriate physical distancing within the Weld County Jail."  Docket No. 1 at 7.  At the hearing, plaintiffs' counsel stated plaintiffs were no longer seeking such relief.  *See also* Docket No. 49-2 (plaintiffs' revised request for relief, which makes no mention of transfer or release).  Accordingly, the Court deems this request withdrawn for purposes of this motion.

[2] The parties also submitted a volume of exhibits to the Court more typical of a four-day jury trial than a preliminary injunction hearing.  As the Court indicated to the parties at the start of the hearing, in making these findings of fact the Court gives little weight to exhibits that, while introduced, were not discussed.

### B.   Findings of Fact

#### 1.   *The Weld County Jail*

The Weld County Jail (the "Jail") is located in Weld County, Colorado.  As the elected Sheriff of Weld County, defendant oversees and operates the Jail.  Defendant is the final decision maker and policy maker for both the Weld County Sheriff's Office and the Jail.

The Jail has a capacity of 1,170 inmates.  Docket No. 26-1 at 25, ¶ 112.  The Jail is generally organized into "pods," which are groups of cells surrounding common areas.  *See* Def's Exh. A-91.  Pods have a variety of configurations.  Some pods have cells that are smaller and are designed for one or two inmates; other pods have larger cells that are designed for four or more inmates.  Some cells, known as "dry" cells, do not have running water or toilets, while some cells do have toilets.

As of April 29, 2020, the Jail's population had been reduced to 478 inmates due to various depopulation efforts by the Sheriff's Office and other entities in Weld County due to the pandemic.  It is the Sheriff's statutory responsibility to hold inmates in the Weld County Jail; he has no authority to unilaterally modify the bonds of pretrial detainees or to release inmates serving a carceral sentence.  Many inmates in the Jail have had recent bond hearings, including plaintiff Richard Barnum.  The state court judge denied Barnum's request to reduce his bond.

#### 2.   *COVID-19 Mitigation at the Jail*

COVID-19 is an infectious disease caused by a novel coronavirus.  *See* "Q&A on coronaviruses (COVID-19)," *World Health Organization*, Apr. 17, 2020,

https://www.who.int/news-room/q-a-detail/q-a-coronaviruses.  Since the COVID-19

pandemic reached Colorado earlier this year, at least 971 people have died from

COVID-19, and 19,703 people have tested positive for the virus.  *See* "Case data,"

*Colorado Department of Public Health and Environment*,

https://covid19.colorado.gov/case-data (last accessed May 11, 2020).  Governor Jared

Polis declared a state of emergency in Colorado on March 11, 2020.  Executive Order

D 2020 003 (March 11, 2020).

      COVID-19 spreads by respiratory droplets, by direct person-to-person

transmission, and by indirect surface-to-person transmission.  To prevent the

transmission of COVID-19, the Centers for Disease Control and Prevention ("CDC")

recommends that people wear masks in public areas where social distancing is not

possible, reduce contacts with other people, wash hands frequently, and regularly

clean and disinfect high-contact surfaces.  Reducing contacts means both ceasing

mass gatherings and practicing "social distancing" or "physical distancing" – staying six

feet away from people who are not a part of your household.  While COVID-19

presents some level of risk to anyone who contracts it, certain individuals – "older

adults and people of any age who have serious underlying medical conditions" – are at

an elevated risk of serious illness or death should they contract COVID-19.  *See*

"People Who Are at Higher Risk for Severe Illness," *Centers for Disease Control and*

*Prevention*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-

at-higher-risk.html (last accessed May 8, 2020).  Specifically, the CDC has identified as

"high-risk for severe illness from COVID-19" people who are 65 years and older, have

chronic lung disease or moderate to severe asthma, have serious heart conditions, are immunocompromised, have severe obesity, have diabetes, have chronic kidney disease and undergoing dialysis, or have liver disease. *See id*. The Court uses the shorthand "medically vulnerable" to refer to persons who are in one or more of these categories.

The first "suspected positive" diagnosis of COVID-19 in the Jail occurred on March 19, 2020. Since that time, defendant has taken certain steps to reduce the spread of the virus within the Jail, including the following:

### a.   Intake

During the booking process, new inmates meet with the Jail's medical staff, who are employed by contractor Turn Key Health Clinics, LLC. The medical staff administers a screening tool to identify whether a new inmate has symptoms of, or has been exposed to individuals with, COVID-19. Def's Exh. A-2. The screening tool asks whether the new inmate (1) has a fever, flu like symptoms, and a cough or shortness of breath, (2) has traveled outside the United States in the last month, and (3) has been exposed to another individual diagnosed or suspected to have COVID-19. *Id*. at 2. If the new inmate answers yes to any of these questions, medical staff conducts further screening of the inmate. The medical staff also gathers self-reported medical information from the inmate, but does not specifically screen for whether the inmate is medically vulnerable to COVID-19 and does not test new inmates for COVID-19. After inmates are booked into the Jail, the Jail places them into one housing unit (the "transition unit") until the unit is full. It is unclear how many inmates go into the

6

transition unit before it is determined to be full.  Once full, the Jail starts a 14-day quarantine of the transition unit.  In the transition unit, there is no segregation of those detainees who are medically vulnerable to COVID-19.  Medical staff check inmates in the transition unit four times per day for COVID-19 symptoms.

Although the Jail has tried to get COVID-19 test kits, it has had difficulty acquiring them due to the scarcity of test kits both nationwide and within Colorado. Docket No. 26-1 at 23, ¶ 100.  The Jail acquired 25 test kits at the end of March and another 100 test kits two weeks later.

### b. Pods

Once the inmates in the transition unit have completed the 14-day quarantine, they are moved into pods.  The evidence is unclear whether the transition unit inmates are kept together as a group or whether the inmates are dispersed into other pods.

The Jail has been on a 23-hour lockdown since March 31, 2020.  During lockdown, inmates are confined to their cells for 23 hours per day, although individuals are let out in certain circumstances, such as if they are housed in a dry cell and need to use the bathroom.  In "Pod C," where Richard Barnum is housed, there are four inmates in his cell, which is approximately 15 feet by 12 feet.  In the "trustee pod," where Kevin Monteiro is housed, there are approximately four to five inmates per cell in each of the pod's four cells.  Within each cell, inmates sleep on bunk beds, with the top bunk approximately two feet away from the bottom bunk.  As a result, it is not possible for either Barnum or Monteiro to maintain six feet of distance from his cellmates while in his cell.

Because defendant believes that optimal social distancing policies are not attainable given the space limitations of the Jail, his plan – based on advice from the Weld County Health Department – has been to treat portions of the Jail as a "family unit." This concept is based on the notion that individuals in households are not expected to maintain social distancing from other members of the household. It is unclear whether the Jail defines a "family unit" as a single cell, a group of cells, or an entire housing unit. While the Jail has recommended that inmates practice social distancing when out of their cells, it has not ordered them to do so. Were defendant to instead attempt to house inmates within the Jail so that each inmate could keep six feet of distance from any other inmate, the maximum capacity of the Jail, in a best-case scenario, would be 350 inmates. Generally, the occupants of several cells are allowed into the common area for an hour at the same time, so there are then as many as ten people in the pod's common area.

The Jail employs professional janitorial staff that does some cleaning in the Jail. Additionally, certain trustee inmates are responsible for cleaning each pod's common area during the day. However, inmates are responsible for cleaning the communal bathrooms themselves. Inmates are issued a spray called "HALT" to sanitize surfaces. Barnum and Monteiro testified that most inmates do not sanitize common areas before and after use.

The Sheriff's Office has tried numerous avenues to acquire an adequate supply of masks for inmates. However, due to the limited supply of masks available and the demand for masks from other entities, defendant testified that the Jail has been unable

to procure the full amount of masks that it would like to have on hand.  On March 13, the Jail placed an initial order for 50 masks for inmates who were suspected positive for COVID-19.  Def's Exh. A-8.  On March 23, the Jail placed an order for 500 disposable surgical masks, intended for staff.  Def's Exh. A-26.  Those surgical masks were distributed to inmates on April 9.  Docket No. 41-1 at 2, ¶ 7.  Barnum and Monteiro testified that the masks are flimsy and that, due to the general shortage of masks, they were forced to wear their masks for at least eight to ten days.  Monteiro also testified that inmates in his pod are not wearing masks because their masks broke and the Jail has not been able to provide them with new ones.

In order to minimize the transmission of COVID-19, the Jail has changed policies and procedures for staff members.  Officers are now assigned to one unit rather than rotating between units.  Officers are required to check their temperature before coming to the Jail and also have their temperature checked when they report.  Officers are directed to social distance as best they can from each other.  Officers have been issued some disposable masks; however, they are primarily encouraged to use personal cloth masks while working in the Jail.

### c.  Response to Sickness

The Jail does not have any policy or procedure designed to minimize the risk to medically vulnerable inmates from contracting COVID-19.  Defendant has not ordered the Jail's medical staff to develop criteria to identify inmates who are at high risk of

injury or death if they contract COVID-19.[3]  Defendant also does not have information

as to how many inmates in the Jail are medically vulnerable.  Defendant testified that

he is aware that certain individuals are at high risk of serious illness or death should

they contract COVID-19.  However, in his opinion, the expanding list of medical

conditions that make people "high risk" means that almost all of the inmates in the Jail

are medically vulnerable.

      If the Jail's medical staff believes an inmate to be symptomatic or if an inmate

tests positive for COVID-19, he is isolated for 14 days.  Def's Exh. A-92 at 3, ¶ 9(f).  Dr.

Franco-Paredes testified that, during both of his inspections of the Jail, inmates in the

isolation unit were not single-celled.  A person can come out of isolation once 14 days

has elapsed and he has tested negative for COVID-19 twice.  Accordingly, the Jail must

have a sufficient number of test kits both to initially confirm that a person is COVID-19

positive and to confirm through two tests that he is COVID-19 negative.  Any inmate

who was in contact with an inmate placed in isolation is placed in quarantine.  Inmates

placed in quarantine are observed by the medical staff.  The Jail's policy is to maintain

the quarantine for at least a 14-day period.  Within the isolation unit, defendant has

instituted "cohorting," which is taking two people who have like health conditions and

housing them in the same cell.  According to the relevant CDC guidance, cohorting is

appropriate in correctional facilities that "do not have enough individual cells" to

_____

    [3] An April 22, 2020 memo from Matthew Turner to defendant states that "[w]e are working on identifying at risk inmates that should be celled alone or with minimal other people in their cells," Docket No. 41-20, but no evidence of the results of these efforts was presented at the hearing.

individually isolate laboratory-confirmed COVID-19 cases and quarantine close contacts, and should be practiced "if there are no other available options."  *See generally* "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" at 15, *Centers for Disease Control and Prevention*, https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf (last accessed May 8, 2020) (hereinafter "CDC Interim Guidance for Correctional Facilities").  The current policy of the Jail is to have people who are cohorting leave their cell together for purposes such as waiting in line for medication or meals.

The medical staff does not treat symptoms consistent with a common cold as being presumptively positive for COVID-19.  Monteiro testified that he got very sick in March and had symptoms that included chest tightness and shortness of breath.  Jail medical staff told him he had the common cold, did not isolate him, and did not test him for COVID-19.  There is evidence in the record that the Jail requires an individual to display at least four symptoms of COVID-19 before he is removed from his pod.  *See* Docket No. 1-4 at 4, ¶ 13.

### 3.   *Plaintiff Background*

Plaintiffs allege that they are at high risk of suffering serious medical complications or death should they contract COVID-19 due to either age, serious underlying health conditions, or both.  *See* Docket No. 7 at 7-10, ¶¶ 17-24.  Although

some plaintiffs are no longer incarcerated in the Jail,[4] plaintiff Richard Barnum has been incarcerated since October 2019.  Barnum has hypertension, high blood pressure, stage three kidney disease, hepatitis C, PTSD, major depression, and liver damage.  The Jail staff never asked him whether he was at a higher risk of harm should he contract COVID-19.  Similarly, Jail staff never informed Barnum that he was at a higher risk of harm should he contract COVID-19.  Barnum has not been offered a single cell due to his medical conditions.

Kevin Monteiro is also an inmate at the Jail.  Monteiro has chronic asthma and chronic obstructive pulmonary disease.  The Jail staff never asked him whether he was at a higher risk of harm should he contract COVID-19.  Similarly, Jail staff never informed Monteiro that he was at a higher risk of harm should he contract COVID-19.  Monteiro has not been offered a single cell due to his medical conditions.

### 4.   Expert Testimony

Dr. Franco-Paredes works in the Division of Infectious Diseases at the University of Colorado Anschutz Medical Campus and has more than 20 years of experience as an infectious disease clinician.  Dr. Franco-Paredes worked on the 2003 SARS pandemic, the 2009 H5N1 influenza outbreak, the 2009 H1N1 influenza pandemic, and the current COVID-19 pandemic.[5]  Dr. Franco-Paredes does not have any background

---

[4] The record is not clear as to exactly which plaintiffs remain in Jail custody.  *See* Docket No. 26 at 38 (indicating that Michael Ward and Colby Propes had been released from the Jail); Docket No. 41 at 10 (indicating that only two plaintiffs remain in custody as of April 24, 2020).

[5] Dr. Franco-Paredes offered expert opinions pursuant to Fed. R. Evid. 702. Defendant stipulated to Dr. Franco-Paredes' qualifications as an expert in medicine,

themselves within the Jail, (4) improve cleaning techniques within the Jail; and (5)

replace masks more frequently or provide cloth masks for inmates.

### 5.    *Data on the Outbreak in the Jail*

The parties provided the Court with data regarding the scope of the COVID-19

outbreak in Weld County Jail.  Pl's Exh. 8.  As of April 29, 2020, 22 inmates had been

tested for COVID-19, with ten inmates testing positive.  *Id*. at 1.  In addition, 17 Jail staff

members had tested positive for COVID-19.  *Id*. at 2.  Between April 11 and 29, the

number of inmates in isolation fluctuated between a high of 16 on April 16 and a low of

eight on April 28.  *Id*. at 1. On April 29, seven inmates who had tested positive for

COVID-19 were in isolation, along with two additional inmates designated "suspected

positive."  *Id*.

## II.   LEGAL ANALYSIS – PRELIMINARY INJUNCTION

To obtain a preliminary injunction, "the moving party must demonstrate four

factors: (1) a likelihood of success on the merits; (2) a likelihood that the movant will

suffer irreparable harm in the absence of preliminary relief; (3) that the balance of

equities tips in the movant's favor; and (4) that the injunction is in the public interest."

*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).[6]  Plaintiffs must

make a "heightened showing of the four factors," *id.*, because they seek a disfavored

---

[6] The Court need not resolve plaintiffs' class certification motion before issuing preliminary injunctive relief.  *See Fish v. Kobach*, 189 F. Supp. 3d 1107, 1148 (D. Kan. 2016) ("[C]ase law supports this Court's authority to issue classwide injunctive relief based on its general equity powers before deciding the class certification motion."); *see also Newberg on Class Actions* § 4:30 (5th ed. Dec. 2019 update) ("[A] court may issue a preliminary injunction in class suits prior to a ruling on the merits.").

mandatory injunction – their requests for relief would "alter the status quo" by requiring defendant to take affirmative actions.  *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005); *see also Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019) (holding that plaintiff must make a "strong showing" in order to obtain an injunction that "mandates action").  The Court addresses each factor in turn.

## A.   Likelihood of Success on the Merits

As noted earlier, plaintiffs bring two claims for unconstitutional conditions of confinement against defendant under 42 U.S.C. § 1983, one under the Eighth Amendment and one under the Fourteenth Amendment.  Both claims are asserted against Sheriff Reams in his official capacity.[7]

### 1.  Municipal Liability

A suit against a government officer in his official capacity is a suit against the entity of which an officer is an agent.  *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).  A local governing body may be sued under § 1983 only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."

---

[7] Defendant contends that plaintiffs' Eighth Amendment claim is moot because both plaintiffs bringing that claim have been released from the Jail.  *See* Docket No. 41 at 10.  However, both of plaintiffs' claims are brought on behalf of the same putative class.  *See* Docket No. 7 at 24-25, ¶ 65 (seeking certification of a class of "[a]ll current and future persons held at the Weld County Jail who are at high risk of complications from COVID-19 . . .").  There is no need to distinguish the two claims for the purpose of determining whether injunctive relief is warranted.  Because defendant does not argue that plaintiffs' Fourteenth Amendment claim is moot, the Court need not resolve whether their Eighth Amendment claim is moot.

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  The three elements of a

*Monell* claim are "(1) official policy or custom, (2) causation, and (3) state of mind."

*Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013).

Defendant argues that Weld County cannot be subject to municipal liability for

plaintiffs' deliberate indifference claim.  Docket No. 26 at 23-27.  The argument is

misplaced.  First, regarding an official policy or custom, defendant ignores that an

official's actions can give rise to municipal liability "where the decisionmaker possesses

final authority to establish municipal policy with respect to the action ordered."

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-83 (1986); *see also Schneider*, 717

F.3d at 770 (noting that "a final decision by a municipal policy maker" may be "deemed

an official policy or custom").  Plaintiffs allege that defendant "is a final policymaker for

Weld County with respect to the customs, policies, and practices of its jail."  Docket No.

7 at 10, ¶ 25.  Defendant agrees.  At the preliminary injunction hearing, defendant

testified that he is the final decision maker and policy maker for both the Weld County

Sheriff's Office and the Jail.  *See also* Docket No. 26-1 at 2, ¶ 5 (defendant's statement

that he was "personally involved in . . . approving" protocols and processes

implemented by the Weld County Sheriff's Office).  Thus, defendant has final

policymaking authority with respect to the Jail such that his actions establish an "official

policy or custom" that plaintiffs may challenge.  Similarly, plaintiffs have adequately

alleged that defendant's challenged policies are "closely related to" the alleged

violation of plaintiffs' Eighth and Fourteenth Amendment rights.  *See Schneider*, 767

F.3d at 770; *see also* Docket No. 7 at 22-23, ¶ 59 (alleging that the Jail is "not taking

16

adequate precautions to protect vulnerable people or to quarantine people with symptoms"). Finally, the relevant state of mind for a municipal liability claim is "deliberate indifference" – "an objective standard which is satisfied if the risk is so obvious that the official should have known of it." *See Barney v. Pulsipher*, 143 F.3d 1299, 1307 n.5 (10th Cir. 1998); *Schneider*, 717 F.3d at 771.[8] Plaintiffs adequately allege that the transmission of COVID-19 and the heightened danger that such transmission poses to the plaintiff class in the Weld County Jail is such a risk. *See, e.g.*, Docket No. 7 at 18, ¶ 43 (alleging that "public health guidance put all sheriffs on notice of the dire risk of the spread of COVID-19 through jails without substantial changes to the jail environment"). At the hearing, defendant testified that he was aware that COVID-19 presented both a general risk to all inmates in the Jail and a heightened risk to members of the plaintiff class. In fact, defendant does not contest, for the purposes of this motion, that COVID-19 satisfies the Eighth Amendment objective standard for deliberate indifference. *See* Docket No. 26 at 29. Thus, the Court rejects defendant's argument that the complaint fails to establish a municipal liability claim against Weld County.

### 2. *Eighth Amendment Claim*

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *See Farmer v. Brennan*, 511 U.S. 825, 828

---

[8] This deliberate indifference standard, which applies to municipal liability, is different from the deliberate indifference standard for an Eighth Amendment claim. *See Barney*, 143 F.3d at 1307 n.5 ("Deliberate indifference . . . is defined differently for Eighth Amendment and municipal liability purposes.").

(1994); *see also Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("The [Eighth]

Amendment . . . requires that inmates be furnished with the basic human needs, one of

which is 'reasonable safety.'" (citing *DeShaney v. Winnebago County Dep't of Social

Servs.*, 489 U.S. 189, 199 (1989)))[9]  "The analysis [of an Eighth Amendment claim]

should not be based on 'a court's idea of how best to operate a detention facility,'" but

should reflect "the evolving standards of decency that mark the progress of a maturing

society," which the Tenth Circuit has characterized as a "lofty standard."  *DeSpain v.

Uphoff*, 264 F.3d 965, 973-74 (10th Cir. 2001) (citing *Rhodes v. Chapman*, 452 U.S.

337, 351 (1981)).  To prevail on the claim that defendant violated the Eighth

Amendment, plaintiffs must show that (1) objectively, the harm they complain of is

---

[9] Plaintiffs' Eighth Amendment claim is brought on behalf of "persons in carceral custody," while their Fourteenth Amendment claim is brought on behalf of pretrial detainees.  *See* Docket No. 7 at 25-27.  Although pretrial detainees are protected under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment, in the Tenth Circuit courts apply "an analysis identical to that applied in Eighth Amendment cases" in determining whether a pretrial detainee's rights were violated at the time he was assaulted.  *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999).  Plaintiffs contend that *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), which held that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one," changed the standard for pretrial detainees making deliberate indifference claims.  Docket No. 1 at 32-33 n.62.  The circuit courts have split on the applicability of *Kingsley* to the medical-care context.  *See Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (joining the Second and Ninth Circuits in concluding that "medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry" but acknowledging that the Fifth, Eighth, and Eleventh Circuits have confined *Kingsley* to the excessive-force context).  The Tenth Circuit has declined to rule definitively on the issue.  *See Burke v. Regalado*, 935 F. 3d 960, 991 n.9 (10th Cir. 2019); *Perry v. Durborow*, 892 F.3d 1116, 1122 n.1 (10th Cir. 2018).  Because the Court finds that plaintiffs have satisfied their burden under the Eighth Amendment standard, which is more favorable to defendant, the Court need not resolve this dispute.  *See Burke*, 935 F.3d at 991 n.9 (noting that the Eighth Amendment standard is more favorable to a defendant).

sufficiently "serious" to merit constitutional protection, and (2) defendant was subjectively aware of a substantial risk to plaintiffs' health or safety and acted in purposeful disregard of that risk.  *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).

In evaluating the objective factor, courts "look to whether the harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause."  *Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005) (quoting *Farmer*, 511 U.S. at 834).   COVID-19 is a potentially deadly disease that has led to unprecedented measures around the world to stop its spread.  While COVID-19 presents some risk of harm to all individuals, the record indicates that members of the plaintiff class face a elevated risk of illness or death should they contract it.  *See* Docket No. 1-1 at 6; Docket No. 1-2 at 3.  Defendant conceded that plaintiffs have satisfied the objective factor of the deliberate indifference test.  *See* Docket No. 26 at 29.  Moreover, he testified at the preliminary injunction hearing that he is aware of the heightened risk of harm that COVID-19 presents to members of the plaintiff class.  Thus, the Court finds that the objective factor is satisfied and focuses its analysis on the subjective factor.

"[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they respond[] reasonably to the risk."  *Farmer*, 511 U.S. at 844.  COVID-19 poses some risk of harm to any individual.  That risk can be thought of as the probability that an individual will contract the virus multiplied by the probability of experiencing serious illness or death from having contracted it.  The first variable – the risk of contracting the virus – is within defendant's capacity to control,

19

while the second variable – the risk of serious illness or death from contracting the

virus – is largely not.  Rather, members of the plaintiff class have a higher risk of

serious illness or death because they are over 55 years of age or have underlying

health conditions.

As noted earlier, by the time of the hearing, defendant had taken several steps

to reduce the risk that inmates will contract COVID-19 in the Jail.  These include (1) an

isolation and quarantine procedure for individuals who are presumed positive for

COVID-19 and for individuals who came in contact with presumptive positive inmates,

(2) a procedure for quarantining new inmates as they enter the Jail, (3) keeping

inmates in "family units" after being quarantined, and (4) locking down the Jail for 23

hours at a time.  Defendant has also provided inmates with masks and cleaning

supplies, and there is some evidence that inmates are able to socially distance in the

hour they spend out of their cell each day.  Plaintiffs' expert, Dr. Franco-Paredes, noted

after his second inspection of the Jail on April 24 that Jail leadership had instituted a

substantial number of interventions to mitigate the impact of COVID-19.  Indeed,

plaintiffs withdrew their initial request for a temporary restraining order on the basis of

interventions made by defendant throughout the first two weeks of April.  As a result of

these interventions, the data before the Court is that, in the month of April, COVID-19

transmission within the Jail has trended downward, with nine inmates isolated as of

April 29.  *See* Pl's Exh. 8.

However, the record indicates that defendant has not instituted any specific

precautions to protect medically vulnerable inmates.  As discussed earlier, these

inmates – older individuals and those with certain underlying health conditions – have an elevated risk of serious illness or death should they contract COVID-19.  Defendant testified at the preliminary injunction hearing that he is aware that COVID-19 presents a higher risk of harm to these individuals.  Despite knowing of that elevated risk, defendant has not ordered the Jail's medical staff to identify those inmates who are medically vulnerable to COVID-19.  As a result, defendant is not aware of how many inmates within the Jail are medically vulnerable, and he does not know which inmates those are.

Although defendant has not made any effort to identify medically vulnerable inmates, he may still be "found free from liability if [he] responded reasonably to the risk" presented to them. *Farmer*, 511 U.S. at 844.  The reasonableness of the Jail's response as to non-vulnerable inmates is not before the Court at this time, as they are excluded from the plaintiff class.   Assuming *arguendo* that the Jail's COVID-19 mitigation efforts were reasonable as to the risk posed to non-vulnerable inmates, the Court considers whether the mitigation efforts were reasonable with respect to medically vulnerable inmates.

### a.   Social Distancing

A jail's ability to facilitate proper social distancing is limited, both by the jail's population and its physical layout.  Defendant testified that, in order to provide six feet of spacing with optimal use of cells, the Jail would have to reduce the inmate population to 350 inmates. *See also* Docket No. 26-1 at 25, ¶ 112.  As defendant testified, he does not have the authority to reduce the inmate population.  However,

defendant has not tried to formulate a plan that would optimize social distancing for medically vulnerable inmates.  As a result, medically vulnerable inmates like Monteiro and Barnum are confined in cells in which it is impossible for them to maintain six feet of distance from their cellmates.  Importantly, defendant has not identified any impediment to formulating such a plan.  Rather, defendant testified that, as a general matter, social distancing is not possible for medically vulnerable inmates while housed in the Jail.  Given that the ability to provide medically vulnerable inmates with the opportunity for social distancing is largely a function of how much cell space is available to them, the Court is unsure how defendant could reach this conclusion without understanding how many inmates are in the medically vulnerable  group.  It is clear to the Court that defendant has the ability to determine a number of possible approaches to increase social distancing within cells and outside of them for the medically vulnerable, just as he did when considering the application of a six-foot social distancing requirement to all inmates.[10]  While the Court does not know whether, for a fact, it is possible to achieve substantially improved social distancing for plaintiffs while simultaneously protecting other inmates, that information is uniquely in defendant's possession.  *See* Docket No. 41 at 5 n.5 (providing the Court with "representative" pod diagrams but stating that disclosure of "the overall floor plan or layout" of the Jail "could

---

[10] Defendant acknowledges that he has no impediment to formulating housing plans to better protect inmates from exposure to COVID-19: "The [Weld County Sheriff's Office] has also continually assessed how best to house inmates within the physical limitations of the [Jail]."  Docket No. 41 at 5.

create a security risk").[11]  Courts have ordered jails to enact social distancing measures

during this pandemic.  *See, e.g.*, *Jones v. Wolf*, 2020 WL 1643857, at *14 (W.D.N.Y.

Apr. 2, 2020) (granting temporary restraining order where, because the detention

facility was at "roughly half of its capacity," it "remain[ed] plausible that" defendants

could provide vulnerable individuals within the facility "with a living situation that

facilitates 'social distancing'").  The Court concludes that defendant's social distancing

efforts with respect to medically vulnerable inmates has not been reasonable.[12]

### b.  Family Groups

The record before the Court does not indicate that the Jail's policies with regard

to family groups are clearly or consistently implemented.  It is unclear whether the Jail

---

[11] In his supplemental response, defendant states that "none of [the plaintiffs] were included in [a] list of inmates [Jail] medical staff identified as high risk for dangers from COVID-19."  *See* Docket No. 41 at 11.  The exhibits cited by defendant in support of this statement do not describe such a list of inmates or explain how such list was developed.  *See* Def's Exhs. B-22, B-25.  Moreover, this statement, if true, raises more questions than it answers.  Plaintiff Richard Barnum testified that he has high blood pressure, stage three kidney disease, hepatitis C, PTSD, major depression, and liver damage.  Despite those medical conditions, Jail medical staff has apparently not identified him as a medically vulnerable inmate.  The Court is thus not convinced, even if the Jail is taking some measures to identify medically vulnerable inmates, that those measures are accurate or adequate and that its criteria are based on acceptable public health agency guidelines.  *See* "People Who Are at Higher Risk for Severe Illness," *Centers for Disease Control and Prevention* (medically vulnerable people include those who are immunocompromised, with chronic kidney disease undergoing dialysis, and with liver disease).

[12] The CDC offers a variety of strategies to provide social distancing in correctional facilities and gives guidance that jails should implement strategies "tailored to the individual space in the facility and the needs of the population and staff."  *See* CDC Interim Guidance for Correctional Facilities at 11.  The evidence does not suggest that defendant's social distancing strategy in the Jail is tailored to the physical space and population of the Jail.

vulnerable inmates or family groups are released to that area and (2) more frequent

professional or trustee cleaning of toilets and sinks (in addition to the current practice

of having cleaning supplies available in these areas) would help minimize medically

vulnerable inmates' risk of contracting the virus while being feasible and practical for

the Jail.

### d.   Monitoring

Defendant has instituted monitoring practices in the transition and isolation

units.  Inmates in the transition unit are checked four times per day for COVID-19

symptoms.  Similarly, inmates in the isolation unit are regularly observed by the

medical staff.  There appear to be no impediments to extending some kind of enhanced

monitoring to medically vulnerable inmates who are not housed in either the transition

or isolation unit.

### e.   Intake

The current intake process appears to present a danger to medically vulnerable

inmates.  While new inmates provide a medical history and are screened for COVID-19

symptoms before being placed in the transition unit, the record indicates that medically

vulnerable inmates are not single-celled or otherwise segregated in the transition unit

as more inmates are placed in the unit.  As a result, defendant's policy appears to

expose medically vulnerable inmates to an elevated risk of contracting COVID-19

during the intake process.

Because of these deficiencies in defendant's response to COVID-19, the Court

is persuaded on the record before it that plaintiffs have shown a substantial likelihood

of success of proving that defendant has acted in purposeful disregard of the elevated

risk of harm that COVID-19 presents to members of the plaintiff class.[14]

## B.   Irreparable Harm

"[A] showing of probable irreparable harm is the single most important

prerequisite for the issuance of a preliminary injunction." *DTC Energy Group, Inc. v.*

*Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (quoting *First W. Capital Mgmt. Co. v.*

*Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017)).   The moving party "must demonstrate

a significant risk that he or she will experience harm that cannot be compensated after

the fact by money damages." *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016).

The Court determines that plaintiffs have shown a significant risk of probable

irreparable harm.  The fact that plaintiffs are exposed to some risk of contracting

COVID-19, however small, is probably not sufficient to prove irreparable harm, even

though they are more vulnerable.  For example, if plaintiffs were released, they would

still suffer some risk of exposure in the community.  However, the plaintiffs who are

---

[14] The cases cited by defendant in his most recent notice of supplemental authority are not on point. *See* Docket No. 54.  Broadly speaking, courts in these cases concluded that prison officials' response to COVID-19 was not deliberately indifferent. *See Money v. Pritzker*, 2020 WL 1820660, at *18 (N.D. Ill. Apr. 10, 2020) (no deliberate indifference where record indicated that defendants had not "turned . . . [a] blind eye and deaf ear to a known problem"); *Mays v. Dart*, 2020 WL 1987007, at *25, (N.D. Ill. Apr. 27, 2020) (granting preliminary injunction under Fourteenth Amendment standard but noting, in dicta, that the Sheriff had "been anything but deliberately indifferent to the risk of harm" from COVID-19); *Valentine v. Collier*, _ F.3d __, 2020 WL 1934431, at *4 (5th Cir. Apr. 22, 2020) (staying injunction where the district court applied the incorrect legal standard for deliberate indifference claims). Deliberate indifference claims, however, are "intensely fact-based." *See Valentine*, 2020 WL 1934431, at *9 (Higginson, J., concurring in the judgment).  On these facts, the Court is satisfied that plaintiffs have shown a substantial likelihood of success on the merits of their deliberate indifference claim.

confined are not only confined in close quarters, but some inmates in the Jail have already contracted COVID-19.  *See* Docket No. 26-1 at 26, ¶ 114 (defendant's declaration that at least ten inmates have tested positive for COVID-19).  Although defendant argues that the decreasing number of confirmed COVID-19 cases in the Jail indicate that plaintiffs do not have a risk of irreparable harm, *see* Docket No. 41 at 11, defendant does not deny that some inmates are still in isolation after contracting COVID-19 in the Jail, and aysmptomatic staff and new inmates present an ongoing possibility of additional sources of infection.  The Jail is taking the preventative measures it is currently taking because of the real risk of COVID-19 exposure to inmates.

### C.    Balance of Equities

The Court finds that the balance of equities weighs in plaintiffs' favor.  The record indicates that plaintiffs and members of the plaintiff class face a high risk of serious illness or death if they contract COVID-19 while in the Weld County Jail.  This outweighs the harms identified by the defendant, which include "maintaining control over the [Jail] without Court supervision" and the costs of complying with plaintiffs' proposed preliminary injunction.  *See* Docket No. 26 at 33-35.  Although the Court acknowledges defendant's interest in retaining discretion to administer the Jail, "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."  *Brown v. Plata*, 563 U.S. 493, 511 (2011).

### D.   Public Interest

The Court finds that entering a preliminary injunction would further the public interest in two ways.  First, "it is always in the public interest to prevent the violation of a party's constitutional rights," as a preliminary injunction would do here.  *See Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012).  Moreover, the Court agrees with plaintiffs that minimizing the exposure of inmates with pre-existing vulnerabilities furthers public health, which is a matter of public interest.  *See, e.g., Castillo v. Barr*, 2020 WL 1502864, at *6 (C.D. Cal. Mar. 27, 2020) (noting that "[t]he public has a critical interest in preventing the further spread of the coronavirus"); *Banks v. Booth*, 2020 WL 1914896, at *12 (D.D.C. Apr. 19, 2020) (observing that "[n]o man's health is an island"). Defendant argues that a preliminary injunction would unreasonably threaten public safety, pointing at length to plaintiffs' arrest records and raising the specter of the Court "overrid[ing] public safety decisions made by Colorado state court judges."  *See* Docket No. 26 at 35-39.  However, as mentioned earlier, plaintiffs have withdrawn any request for an order that would release or transfer prisoners from the Jail.  Thus, this argument fails to show that a preliminary injunction would be adverse to the public interest.

In sum, the Court is satisfied that plaintiffs have made a heightened showing that they are likely to succeed on the merits of their claims, that they will suffer irreparable harm in the absence of a temporary restraining order, and that the balance of equities and public interest tips in their favor.  *See RoDa Drilling*, 552 F.3d at 1208.  Thus, plaintiffs are entitled to a preliminary injunction.

## III.  INJUNCTION

Having determined that plaintiffs are entitled to a preliminary injunction, the

Court turns to the appropriate scope of the injunction.

Rule 65(d)(1) of the Federal Rules of Civil Procedure requires every order

granting an injunction or restraining order to "(A) state the reasons why it issued; (B)

state its terms specifically; and (C) describe in reasonable detail – and not by referring

to the complaint or other document – the act or acts restrained or required."

Additionally, because this is a civil action related to prison conditions, the Court must

also consider the requirements of 18 U.S.C. § 3626, a portion of the Prison Litigation

Reform Act.[15]  Section 3626(a)(2) requires that preliminary injunctive relief be "narrowly

drawn, extend no further than necessary to correct the harm the court finds requires

preliminary relief, and be the least intrusive means necessary to correct that harm."

Further, the Court must "give substantial weight to any adverse impact on public safety

or the operation of a criminal justice system caused by the preliminary relief."  *Id*.

Finally, any preliminary injunctive relief that "requires . . . a government official to

exceed his or her authority under State or local law" may only be issued upon a finding

that "(i) Federal law requires such relief to be ordered in violation of State or local law;

---

[15] This statute extends to relief requested by pretrial detainees.  *See* 18 U.S.C.
§ 3626(g)(3) (defining "prisoner" as, among other things, "any person subject to
incarceration . . . who is accused of . . . violations of criminal law").  Similarly, the Weld
County Jail is a "prison" within the meaning of the statute.  *See id*. § 3626(g)(5)
(defining "prison" as, among other things, any "local facility that incarcerates or detains
[individuals] accused of . . . violations of criminal law").

29

(ii) the relief is necessary to correct the violation of a Federal right; and (iii) no other relief will correct the violation of the Federal right." *Id*. § 3626(a)(1)(B).

The Court evaluates plaintiffs' requested injunction as set out in Docket No. 49-2.[16]

## A.   Social Distancing and Identification of Medically Vulnerable Inmates

Plaintiffs request that the Court order defendant to "[p]hysically distance all inmates from one another and staff within the Weld County Jail." Docket No. 49-2 at 3, ¶ 1.  Relatedly, plaintiffs request an order for defendant to "[i]dentify inmates at high-risk . . . from COVID-19 . . . and physically distance these individuals particularly." *Id*., ¶ 2.  As discussed previously, the record indicates that defendant has taken no steps to identify those inmates who are medically vulnerable and to prioritize them for single cells or other housing situations where they can properly socially distance themselves. Accordingly, the Court will order defendant to identify those individuals who are, according to the CDC guidelines, at a high risk of serious illness or death from COVID-19.  *See* "People Who Are at Higher Risk for Severe Illness," *Centers for Disease Control and Prevention* (identifying people as medically vulnerable who are 65 years and older, have chronic lung disease or moderate to severe asthma, have serious heart conditions, are immunocompromised, have severe obesity, have diabetes, have chronic kidney disease and are undergoing dialysis, or have liver disease).

---

[16] While plaintiffs' overarching goal for injunctive relief has been consistent – "ensur[ing] that [p]laintiffs are protected from the threat of COVID-19 exposure" while held within Weld County Jail, *see* Docket No. 1 at 5-6 – the exact scope of plaintiffs' requested relief has shifted over the course of this case.  *Compare id*. at 6-7 *with* Docket No. 49-2 at 3-4.

Once these individuals have been identified, defendant is ordered to put in place a plan to enhance the general steps already taken in the Jail in order to better protect these medically vulnerable individuals.  The plan should include taking steps to socially distance these individuals within the Jail, to the extent practicable given the Jail's physical layout and population level.  The Court recognizes that, due to the lack of data as to how many medically vulnerable inmates are in the Jail, it is currently unclear to what extent these inmates can be socially distanced.  However, the record indicates that, while it is not possible for *all* inmates to socially distance according to CDC guidelines given the Jail's current population level, the Jail is well below half of its maximum capacity, indicating that there is space within the Jail to increase the amount of physical distancing for at least some inmates.

Defendant is ordered to consider whether, as part of his plan to minimize the risk of transmission to medically vulnerable inmates, such inmates should be moved to one or more pods made up solely of medically vulnerable inmates.  As Monteiro testified, some inmates are not taking precautions available to them, such as wearing masks or disinfecting common areas.[17]  The Jail can consider, based on its own observations, whether medically vulnerable inmates are more likely to take precautions for their own

---

[17] Defendant raised the absurd specter of having to Taser inmates to enforce social distancing.  See Docket No. 26 at 8.  While jails have limited means to make all inmates wear masks and follow social distancing directives, any plan must take into account the risk to medically vulnerable inmates from non-compliant inmates, utilizing common sense (e.g. using family groupings or staggering release of individual cells) as a touchstone.

safety and are thus likely to be safer in an environment consisting only of medically vulnerable inmates.

### B.   Sanitation and Hygiene

Plaintiffs request an order for defendant to "professionally disinfect and sanitize" the Jail and to "[p]rovide hygiene supplies . . . to inmates at all times."  Docket No. 49-2 at 3, ¶¶ 3-4.  Plaintiffs concede in their reply that at least some of this relief has been partially implemented.  *See* Docket No. 49 at 5 (noting that "hygiene products have been provided to inmates").  Further, defendant testified at the hearing about the steps the Jail has taken to sanitize, which include making both cleaning supplies and personal hygiene supplies available to inmates.  However, the record also indicates that the current sanitation procedures are inadequate to protect medically vulnerable inmates, as inmates are not consistently sanitizing common areas and the Jail does not have either janitorial staff or trustees cleaning common areas several times a day, as recommended by CDC guidelines.  Accordingly, the Court will order the Jail to implement a policy to improve sanitation for toilets, sinks, and common areas used by medically vulnerable inmates, either by increasing the use of professional cleaning staff or by increasing the frequency with which pods are cleaned by trained trustees.

### C.   Personal Protective Equipment

Plaintiffs request that the Court order defendant to "[p]rovide adequate personal protection equipment . . . to all staff members and inmates."  Docket No. 49-2 at 3, ¶ 5.  Plaintiffs have not introduced evidence regarding personal protective equipment other than masks, so that is what the Court will focus on.  The record regarding masks is

concerning.  Both Monteiro and Barnum testified that they had been wearing Jail-provided surgical face masks for far longer than the recommended three days.[18]  Dr. Franco-Paredes criticized the surgical masks given to inmates as unfit for long-term wear.  Defendant testified that, due to supply chain issues and competition with other entities in Weld County that need masks, the Jail has been unable to get the full amount of masks that it needs.  However, the Jail's efforts to obtain masks have focused on staff, not inmates.  Thus, the defendant is ordered to formulate a plan to obtain a sufficient number or type of masks for inmates so that they may be used properly.

### D.   Quarantine and Isolation Procedure

Plaintiffs request that defendant be ordered to "[i]mplement a testing procedure to identify inmates who are possibly carrying COVID-19" and "a quarantine and isolation procedure that is in line with CDC guidelines for all individuals exposed to COVID-19 and new intakes to the Weld County Jail."  Docket No. 49-2 at 4, ¶ 6-7.  The Court is not persuaded that the record supports such relief.  As for testing, it is not clear from the record that the Jail has the quantity of test kits necessary to implement a wide-ranging testing procedure or that the Jail can acquire a sufficient number of test kits.  As for the quarantine procedure, defendant testified that inmates in the Jail who are symptomatic or test positive for COVID-19 are isolated for 14 days, and that such a practice is consistent with the CDC guidelines.  Plaintiffs argue in their reply that this

---

[18] Defendant has recognized the need for Jail staff to be able to rotate their masks for decontamination purposes.  *See* Docket No. 41 at 4.

practice is unreasonable because it focuses only on symptomatic inmates.  Plaintiffs,

however, do not explain how the current procedure is inconsistent with the CDC

guidelines or otherwise unreasonable.  Plaintiffs have not demonstrated an entitlement

to injunctive relief on this issue.

Nevertheless, the Court agrees with plaintiffs that injunctive relief is needed for

new intakes into the Jail.  Defendant testified that new inmates are placed into a

designated housing unit until that unit is "full," at which point the Jail starts a 14-day

clock before those individuals are introduced to the general population.  The Jail

complies with the CDC recommendation for new inmates generally.  *See* CDC Interim

Guidance for Correctional Facilities at 14 (recommending that, if possible, jails

quarantine all new inmates for 14 days).  However, the Jail places more than one

inmate in a cell in the transition unit, and there is no evidence that new inmates are

given a COVID-19 test.  *See id*. at 4 (noting that, ideally, "each quarantined individual

would be quarantined in a single cell").  As a result, the intake procedure may expose

medical vulnerable inmates to other inmates in the transition unit who may be infected

with COVID-19.  There does not appear to be any impediment to coordinating

increased social distancing of medically vulnerable inmates in the transition unit with

the Jail's plan to increase social distancing once an inmate leaves the transition unit.

### E.   Food Handling and Delivery

Plaintiffs request that the Court order defendant to "[t]ake particularly heightened

precautions with respect to food handling and delivery."  Docket No. 49-2 at 4, ¶ 8.

However, plaintiffs offer no evidence that COVID-19 is transmissible via food or that the

Jail's current food handling and sanitation procedures are inadequate.  *See* "Food

Safety," https://www.usda.gov/coronavirus (last accessed May 7, 2020) (noting that the

USDA is "not aware of any reports at this time of human illnesses that suggest COVID-

19 can be transmitted by food").

### F.   Educational and Informational Materials

Finally, plaintiffs request that the Court order defendant to "[p]rovide accurate,

up-to-date educational and informational materials" about COVID-19's effect on the

facility.  Docket No. 49-2 at 4, ¶ 9.  However, there is evidence in the record that

defendant is providing some informational materials within the Jail.  *See, e.g.*, Def's

Exh. A-38; Docket No. 26-1 at 20-21, ¶¶ 84, 87.  Accordingly, interim injunctive relief in

this area does not appear necessary in order to mitigate the risk of harm to members of

the plaintiff class.

### G.   Security

Under Fed. R. Civ. P. 65(c), "[t]he court may issue a preliminary injunction or a

temporary restraining order only if the movant gives security in an amount that the court

considers proper to pay the costs and damages sustained by any party found to have

been wrongfully enjoined or restrained."  A trial court has "wide discretion under Rule

65(c) in determining whether to require security."  *Winnebago Tribe of Neb. v. Stovall*,

341 F.3d 1202, 1206 (10th Cir. 2003) (internal quotations omitted).  Plaintiffs argue that

the Court should waive the security requirement.  Docket No. 1 at 52.  Defendant

argues that the Court should order that plaintiffs post a security of $1,000,000.  Docket
No. 41 at 12-13.[19]

The Court agrees with plaintiffs.  First, plaintiffs represent that they are indigent.
*See* Docket No. 1 at 52.  The pretrial detainees are in the Jail because they are unable
to post bond.  Indigent plaintiffs "ordinarily should not be required to post a bond under
Rule 65(c)."  *See Bass v. Richardson*, 338 F. Supp. 478, 490 (S.D.N.Y. 1971); *see also*
11A *Fed. Prac. & Proc.* § 2954 (noting that *Bass* "seems correct and has been followed
by other courts").  Second, the Tenth Circuit has indicated that "a minimal bond amount
should be considered" in cases where a party is seeking to vindicate a public interest.
*See Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002), *abrogated on other
grounds by Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir.
2016).  Finally, the Court is not persuaded that compliance with this order will cause
significant damages to defendant while this order is in effect.  There is no evidence in
the record indicating that cost is an obstacle to social distancing or instituting increased
sanitation measures in the Jail.  Thus, the Court will waive the security requirement.

## IV.   CONCLUSION

The COVID-19 pandemic presents a nearly unprecedented challenge to every
person and institution in our society, and the Court acknowledges that defendant faces

---

[19] Defendant initially requested a security of $500,000, a figure obtained by
multiplying half of the daily net operating cost of the Jail by the 14 days that a
temporary restraining order would be in effect.  *See* Docket No. 26 at 39 n.13.  As
defendant conceded in his brief, the Court finds that ordering indigent plaintiffs to post
substantial security based on the daily operating cost of the entire jail – not the cost of
complying with any injunctive relief – would be "harsh."  *See id.*

difficult considerations in how best to respond.  However, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 483 U.S. 78, 84 (1987).  The record indicates that defendant has failed to take adequate measures to protect members of the plaintiff class from COVID-19 given that they face a heightened risk of serious illness or death from the virus.  Accordingly, plaintiffs' conditions of confinement violate the Eighth Amendment to the Constitution, and plaintiffs are entitled to a limited preliminary injunction to ameliorate those conditions.

Such an injunction has no adverse effect on public safety, does not have more than a minimal adverse effect on the operation of the criminal justice system, is narrowly drawn, extends no further than necessary to correct the harm the Court finds requires preliminary relief, and is the least intrusive means necessary to correct that harm.  *See* 18 U.S.C. § 3626(a)(2).

Therefore, it is

**ORDERED** that the portion of plaintiffs' Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing [Docket No. 1] seeking a preliminary injunction is GRANTED IN PART.  It is further

**ORDERED** that, on or before **May 18, 2020, at 5:00 p.m.**, defendant shall certify to the Court that he has compiled a list of those persons ("medically vulnerable inmates") currently held at the Weld County Jail who have one or more of the following conditions: are 65 years and older, have chronic lung disease or moderate to severe asthma, have serious heart conditions, are immunocompromised, have severe obesity,

37

have diabetes, have chronic kidney disease and undergoing dialysis, or have liver disease.  Defendant shall provide to the Court and plaintiffs a list of medically vulnerable inmates by inmate number, identifying for each what risk categories the inmate has and explaining what process he used to identify medically vulnerable inmates.  It is further

ORDERED that, on or before **May 21, 2020, at 5:00 p.m.**, defendant is ordered to institute the following policies or procedures in the Weld County Jail:

(1) A policy ensuring that, to the maximum extent possible considering the Jail's physical layout, population level, and classification needs, medically vulnerable inmates are "socially distanced" from other inmates housed in the Jail.  If social distancing is effectively impossible for some or all of the medically vulnerable inmates in the Jail, such policy may be supplemented by housing medically vulnerable inmates together in one or more pods.

(2) A procedure, as part of the intake of new inmates into the Jail, for medically vulnerable inmates to be single-celled or otherwise socially distanced, to the maximum extent possible considering the Jail's physical layout and classification needs, while housed in the transition unit.

(3) A policy of enhanced sanitation procedures in areas where medically vulnerable inmates are housed.  This may include expanded use of professional cleaning services of the Jail and/or increasing the frequency with which trustees clean common areas in non-trustee pods.  Such policy should be compliant with the CDC guidelines for cleaning and disinfecting practices.

38

(4) A plan to obtain a sufficient number or type of masks so that inmates do not need to wear them for more than their intended duration or so that inmates may be able to clean them.

(5) A policy providing for increased monitoring of medically vulnerable inmates for symptoms of COVID-19.

It is further

**ORDERED** that, on or before **May 21, 2020, at 5:00 p.m.**, defendant is ordered to file a report with the Court, identifying what new policies have been instituted in accordance with this order.  Defendant shall explain in such report what steps the Jail has taken to acquire an adequate mask supply for inmates housed in the Jail.  It is further

**ORDERED** that this order will expire in 90 days unless extended by the Court.  It is further

**ORDERED** that, pursuant to Fed. R. Civ. P. 65(c), plaintiffs will not be required to post a bond for the reasons discussed in this order.  It is further

**ORDERED** that plaintiffs' motion for a preliminary injunction is otherwise denied.


DATED May 11, 2020.

                                        BY THE COURT:


                                        _____
                                        PHILIP A. BRIMMER
                                        Chief United States District Judge